733 So.2d 657 (1999)
STATE of Louisiana
v.
Charisma JACKSON.
No. 98-KA-1254.
Court of Appeal of Louisiana, Fifth Circuit.
March 30, 1999.
*658 Paul D. Connick, Jr., District Attorney, Terry M. Boudreaux, Rebecca J. Becker, Deborah A. Villio, Assistant District Attorneys, Gretna, for Plaintiff/Appellee.
Bruce G. Whittaker, Louisiana Appellate Project, Gretna, for Defendant/Appellant.
Panel composed of Judges H. CHARLES GAUDIN, CHARLES GRISBAUM, Jr., and SOL GOTHARD.
GOTHARD, Judge.
Defendant, Charisma Jackson, was convicted of cruelty to a juvenile in violation of LSA-R.S. 14:93. The trial judge sentenced the defendant on October 27, 1998, to serve three years imprisonment at hard labor. That sentence was suspended and the defendant was placed on active probation for three years, with special conditions. Defendant appeals. We affirm the defendant's conviction and sentence.
On the night of October 24, 1996, the defendant, Charisma Jackson, brought her two-year old son, Demark McGrue, to the Meadowcrest Hospital Emergency Room. At trial, Dr. Beaehren, the emergency room physician who treated Demark that night, testified that Ms. Jackson reported that Demark had fallen off of a rocking horse. Dr. Beaehren observed bruising on the side of Demark's head and face, as well as bruising on the child's upper arms. Dr. Beaehren told the jury that he suspected child abuse because Demark's injures were not consistent with falling off of a horse. The doctor called Child Protection Services that night.
Patrice Hammond, a social worker with the Crisis Unit of the Office of Community Services, became involved in the case on October 25, 1996 and investigated the allegations of abuse. She testified that Dr. Beaehren told her that Demark's injuries were not consistent with the explanation Ms. Jackson had provided for his injuries. Ms. Hammond testified that she had also talked to the defendant on the night of October 25, 1996, and told the defendant that Demark, the oldest of the defendant's *659 three children, must live with the defendant's parents during the course of the investigation. Ms. Hammond further advised the defendant that Demark was to have no more contact with Willie Keller, the defendant's live-in boyfriend and the defendant agreed to comply.
One month later, on November 22, 1996, Demark was once again taken to the Meadowcrest Hospital Emergency Room, with more serious injuries. Dr. Matthew Grimm, an orthopedic surgeon, examined Demark at Meadowcrest Hospital. Dr. Grimm testified that Demark had a broken thigh bone, which he placed in traction. He then sent Demark to Children's Hospital, where the child received additional treatment from Dr. Scott Benton. At that time, Ms. Hammond discovered that the defendant was not in compliance with her agreement because she had again allowed Demark to be in the care of Willie Keller on that day.
Dr. Benton, an expert in pediatric forensic medicine, testified that Demark's femur was completely dislocated. Dr. Benton further testified that Demark had also suffered blunt abdominal trauma that had caused injury to his liver. Dr. Benton testified that his notes reflected that Ms. Jackson was not at the hospital and that Ms. Jackson's sister, Stephanie, had told him that another sister found Demark at the house in pain and had brought him to the emergency room. Based on his evaluation of Demark, Dr. Benton determined that the child's injuries were consistent with abuse.
Detective Wayne Lawrence of the Gretna Police Department assisted in the criminal investigation of possible child abuse. Detective Lawrence identified state's exhibits one and two as photographs of Demark's November injuries. One of the photographs depicted Demark in traction. Detective Lawrence testified that the first officer on the scene noted that there were blisters on Demark's feet and the other photograph was taken to show these blisters.
On cross-examination, Detective Lawrence testified that the defendant had given a statement to him and told him that she had left her children in Willie Keller's care on November 22, 1996 while she went to work. The children were in good condition when she left. Ms. Jackson related that when she came home from work at 5:30 p.m., Keller was not there and the children were unattended. She told the detective that she climbed in a window because she did not have a key to the door. Thereafter, she noticed something wrong with Demark's leg. She told Detective Lawrence that, at 5:45 p.m. she and the children left through the window and took a taxi to Shoney's where she and Keller were employed, so that her supervisor could look at Demark's leg. Her supervisor then drove her and Demark to the hospital. Detective Lawrence further testified that Willie Keller told him that he had left the home at 5:45 p.m., and that when he returned, the children were gone. He then went to work.
Detective Lawrence subsequently submitted warrants for both the defendant's and Keller's arrest.
After learning of the November incident, Ms. Hammond concluded that the defendant had allowed Demark to return to a dangerous environment and transferred the case to the Family Service Unit of Child Protection. Ms. Hammond testified that she believed that the risk to Demark in his mother's care was high and that the defendant displayed a lack of willingness to protect Demark from harm. Rather, Ms. Hammond testified that the defendant's primary focus was to maintain the relationship with Willie Keller. Ms. Hammond testified that the defendant had moved out of Willie Keller's home on November 23, 1996. Finally, Ms. Hammond testified that her office had received another complaint of child abuse in June 1998, the month of trial, concerning a skull fracture sustained by the defendant's seven month-old child.
*660 Terry Brignac of the Family Service Unit testified that an investigation was conducted following the November 1996 incident. Mr. Brignac testified that following psychological evaluation of the defendant, a case plan was designed in which the defendant was required to remain in the home of her parents, attend parenting classes, and individual therapy. Defendant, however, only attended two of the required eight parenting classes. Finally, Mr. Brignac testified that approximately a month after he received the case, he returned Demark to his mother's care because she was living in her parents home and because of Demark's age, it was important to maintain the parent/child relationship.
Twenty-one year old Charisma Jackson testified on her own behalf. The defendant testified that on October 24, 1996, Willie Keller told her that Demark had fallen off of a rocking horse, and that is what she related to the physician at Meadowcrest. She testified that she thought that Keller's mother had accompanied her to the hospital that night. The defendant denied that anyone had told her that they did not believe that Demark had fallen off of the rocking horse. She admitted that Child Protection had instructed her that Demark was to have no contact with Keller, and that he must stay at her parents' house. However, the defendant stated that she thought the restriction applied only for that night, and that it was permissible for Demark to subsequently return to Willie Keller's home in Gretna. The defendant also testified that she needed Keller to watch her children, but admitted that she had wanted her relationship with him to work out.
The defendant testified that on November 22, 1996, she had left the children with Willie Keller because there was no one else who could watch them. After she climbed through the window, she noticed Demark pointing to his leg. She pulled his pants down and saw bruising and swelling on his leg. She climbed back out of the window. The defendant explained that she took a taxi to Shoney's because she did not have enough money to get to the hospital. She said that her supervisor at Shoney's drove them to the hospital. She stated that she left after the doctors told her what was wrong with Demark, and also that she spoke to Patrice at the hospital. She then returned to Shoney's where she encountered Willie Keller. The defendant testified that when she asked him what had happened, he said that he did not know. When the prosecutor questioned the defendant concerning a seven-millimeter circular healed lesion on Demark's upper arm that had been noticed by Dr. Benton, the defendant said that she did not notice it. She denied that she had burned his arm or his foot, and testified that she did not smoke.
In her appeal, defendant contends that the evidence is insufficient to support her conviction of cruelty to a juvenile because the state failed to prove that she intentionally neglected the child or was criminally negligent in her care of the child.
The standard for testing the sufficiency of evidence requires that a conviction be based on proof sufficient for any rational trier of fact, viewing the evidence in the light most favorable to the prosecution, to find the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Hawkins, 96-0766, p. 7 (La.1/14/97), 688 So.2d 473, 479; State v. Stoltz, 98-235 (La.App. 5 Cir. 8/25/98), 717 So.2d 1243. When circumstantial evidence is used to prove the commission of the offense, LSA-R.S. 15:438 mandates that, "assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence." The requirement of LSA-R.S. 15:438 does not establish a standard separate from the Jackson standard, but rather provides a helpful methodology for determining the existence of reasonable doubt. *661 State v. Captville, 448 So.2d 676 (La.1984). Ultimately, all evidence, both direct and circumstantial, must be sufficient to support the conclusion that the defendant is guilty beyond a reasonable doubt. State v. Burrow, 565 So.2d 972, 976 (La.App. 5 Cir.1990), writ denied, 572 So.2d 60 (La. 1991); State v. Guccione, 96-1049 (La.App. 5 Cir. 4/29/97), 694 So.2d 1060, writ denied, 97-2151 (La.3/13/98), 712 So.2d 869. When a case involves circumstantial evidence, and the jury reasonably rejects the hypothesis of innocence presented by the defendant, that hypothesis falls and the defendant is guilty unless there is another hypothesis that raises a reasonable doubt. State v. Chester, 97-1001, p. 1 (La.12/19/97), 707 So.2d 973; State v. Hopson, 97-509, p. 3 (La.App. 5 Cir. 11/25/97), 703 So.2d 767, 769.
The defendant was convicted of cruelty to a juvenile, which is defined in LSA-R.S. 14:93(A) as follows:
A. Cruelty to juveniles is the intentional or criminally negligent mistreatment or neglect, by anyone over the age of seventeen, of any child under the age of seventeen whereby unjustifiable pain or suffering is caused to said child. Lack of knowledge of the child's age shall not be a defense.
The term "intentional" as used in LSA-R.S. 14:93 refers to general criminal intent, "present whenever there is specific intent, and also when the circumstances indicate that the offender, in the ordinary course of human experience, must have adverted to the prescribed criminal consequences as reasonably certain to result from his act or failure to act." LSA-R.S. 14:10(2). See, State v. Sumler, 395 So.2d 766, 769 (La.1981). Thus, LSA-R.S. 14:93 requires general criminal intent to mistreat or neglect to cause the child unjustifiable pain and suffering. See, State v. Morrison, 582 So.2d 295 (La.App. 1 Cir. 1991).
An alternative to proving that an accused intentionally mistreated or neglected a child, LSA-R.S. 14:93 permits the state to prove the defendant was criminally negligent in his or her mistreatment or neglect of the child. Criminal negligence "exists when, although neither specific nor general criminal intent is present, there is such disregard of the interest of others that the offender's conduct amounts to a gross deviation below the standard of care expected to be maintained by a reasonably careful man under like circumstances." LSA-R.S. 14:12. Unlike general or specific criminal intent, criminal negligence is essentially negative. State v. Rock, 571 So.2d 908 (La.App. 5 Cir.1990), writ denied, 577 So.2d 49 (La. 1991). Rather than requiring the accused intended the consequences of his actions, criminal negligence is found from the accused's gross disregard for the consequences of his actions. State v. Rock, supra.
But ordinary negligence does not constitute proof of criminal negligence, and the State is required to show more than a mere deviation from the standard of ordinary care. State v. Rock; supra; State v. G.R., 95-735, p. 3 (La.App. 5 Cir. 3/26/96), 672 So.2d 1009, 1010, writ denied, 96-1021 (La.6/28/96), 675 So.2d 1122.
In the instant case, the defendant argues that the state failed to prove that her leaving Demark in the care of Willie Keller after the October incident was a gross deviation below the standard of care. Rather, she asserts that her decision was "clearly unwise", but that her "error in judgement was not so egregious as to amount to a gross deviation below the standard of care..." The record reflects, however, that the state established the defendant's criminal negligence beyond a reasonable doubt. Dr. Beaehren testified that he informed the defendant on October 25, 1996, that he did not believe Demark's injuries were consistent with the history that her boyfriend had provided. Ms. Hammond testified that she talked to the defendant on October 25, 1996, at which time she instructed the defendant that Demark *662 was to stay with the defendant's parents, and the defendant agreed. Ms. Hammond also told the defendant that Demark was to have no further contact with Willie Keller. Ms. Hammond further testified that after she discovered that the defendant had again left Demark in the care of Willie Keller, she "validated" the case for "lack of supervision," which Ms. Hammond explained means that the defendant was allowing Demark to return to a dangerous environment. Ms. Hammond further testified that she determined that the risk to Demark in the defendant's care was high. Finally, Ms. Hammond testified that she concluded that the defendant lacked a willingness to protect Demark from harm, and that the defendant's primary focus was "maintaining her relationship with Mr. Keller" ... "as opposed to aiding us and protecting the child."
The defendant, on the other hand, denied that Dr. Beaehren had told her that he did not believe her story that Demark could not have received his injuries from falling off of the rocking horse. While the defendant admitted that Ms. Hammond told her that Demark was to have no contact with Keller and that he must stay at her parents' home, she testified that she thought Ms. Hammond meant that the restrictions applied for that night only. The defendant also testified that she believed that it was permissible for Demark to stay with Keller.
The jury was required to evaluate the testimony of both the state's witnesses and testimony of the defendant. It is well-settled that where there is conflicting testimony as to factual matters, the question of credibility of witnesses is within the sound discretion of the trier of fact. State v. Price, 94-214, p. 7 (La.App. 5 Cir. 1/31/95), 650 So.2d 360, 363. Here, the jury made a credibility determination and believed the testimony of the state's witnesses rather than the testimony of the defendant. It is not the function of this court to assess the credibility of witnesses or to re-weigh the evidence. State v. Bordenave, 95-2328, p. 2 (La.4/26/96), 678 So.2d 19, 20; State ex rel. Graffagnino v. King, 436 So.2d 559, 563 (La.1983); State v. Batiste, 96-1010, p. 14 (La.App. 5 Cir. 1/27/98), 708 So.2d 764, 772, writ denied, 98-0913 (La.9/4/98), 723 So.2d 954. Viewing the evidence in the light most favorable to the prosecution, we find that a rational trier of fact could have concluded that the state proved beyond a reasonable doubt, and to the exclusion of every reasonable hypothesis of innocence, that the defendant committed the offense of cruelty to a juvenile.
Defendant also requests that we review the record for errors patent. We have conducted an error patent review in accordance with La.C.Cr.P. art. 920; State v. Oliveaux, 312 So.2d 337 (La.1975); and State v. Weiland, 556 So.2d 175 (La.App. 5 Cir.1990). We have reviewed the record and find no error which warrants our consideration.
For the above discussed reasons, the defendant's conviction and sentence are affirmed.
AFFIRMED.