870 So.2d 618 (2004)
STATE of Louisiana, Appellee,
v.
Barbara SMITH, Appellant.
No. 38,154-KA.
Court of Appeal of Louisiana, Second Circuit.
April 14, 2004.
Rehearing Denied May 6, 2004.
*619 George Britton, III, for Appellant.
Jerry Jones, District Attorney, Shirley M. Wilson, Assistant District Attorney, for Appellee.
Before WILLIAMS, GASKINS and LOLLEY, JJ.
GASKINS, J.
The defendant, Barbara Smith, was convicted by a six-person jury of attempted cruelty to the infirm. She was sentenced to serve five years imprisonment at hard labor, suspended, and put on five years supervised probation with special conditions. The defendant now appeals. Her conviction and sentence are affirmed.

FACTS
In February 2002, an ambulance was called to the home of 83-year-old Johnnie Scott. Ms. Scott lived with her biological son, Stanley Scott (Stanley), her informally adopted daughter, Barbara Smith, and two grandchildren. Ms. Scott was found on a sofa soaked in urine and feces. Ambulance workers noted that Ms. Scott was very sick and, after some resistance from her, she was transported to E.A. Conway Hospital.
After cleaning Ms. Scott from "head to toe," emergency room personnel determined that she was in serious or critical condition with numerous decubitus ulcers (bedsores) and a large, fresh wound on her leg. Emergency room personnel contacted *620 the Monroe Police Department and made a complaint of suspected elder abuse.
The defendant was eventually arrested and charged with cruelty to the infirm. She was found guilty by a jury of attempted cruelty to the infirm. She now appeals.

Legal Principles
Although the record does not reflect that the defendant filed a motion for post verdict judgment of acquittal pursuant to La. C. Cr. P. art. 821, this court will consider sufficiency arguments advanced by the defendant in the absence of such a motion. State v. Green, 28,994 (La.App.2d Cir.2/26/97), 691 So.2d 1273.
The standard of appellate review for a sufficiency of the evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); State v. Cummings, 95-1377 (La.2/28/96), 668 So.2d 1132; State v. Hunter, 33,066 (La.App.2d Cir.9/27/00), 768 So.2d 687, writs denied, XXXX-XXXX (La.10/26/01), 799 So.2d 1150, 2001-2087 (La.4/19/02), 813 So.2d 424. This standard, now legislatively embodied in La. C. Cr. P. art. 821, does not provide the appellate court with a vehicle to substitute its own appreciation of the evidence for that of the fact finder. State v. Robertson, 96-1048 (La.10/4/96), 680 So.2d 1165. The appellate court does not assess the credibility of witnesses or reweigh evidence. State v. Smith, 94-3116 (La.10/16/95), 661 So.2d 442.
The Jackson standard is applicable in cases involving both direct and circumstantial evidence. An appellate court reviewing the sufficiency of evidence in such cases must resolve any conflict in the direct evidence by viewing that evidence in the light most favorable to the prosecution. When the direct evidence is thus viewed, the facts established by the direct evidence and inferred from the circumstances established by that evidence must be sufficient for a rational trier of fact to conclude beyond a reasonable doubt that the defendant was guilty of every essential element of the crime. State v. Sutton, 436 So.2d 471 (La.1983); State v. Owens, 30,903 (La. App.2d Cir.9/25/98), 719 So.2d 610, writ denied, 98-2723 (La.2/5/99), 737 So.2d 747.
La. R.S. 14:93.3, regarding cruelty to the infirm, provides in pertinent part:
A. Cruelty to the infirmed is the intentional or criminally negligent mistreatment or neglect by any person, including a caregiver, whereby unjustifiable pain, malnourishment, or suffering is caused to the infirmed, a disabled adult, or an aged person, including but not limited to a person who is a resident of a nursing home, mental retardation facility, mental health facility, hospital, or other residential facility.
B. "Caregiver" is defined as any person or persons who temporarily or permanently is responsible for the care of the infirmed, physically or mentally disabled adult, or aged person, whether such care is voluntarily assumed or is assigned. Caregiver includes but is not limited to adult children, parents, relatives, neighbors, daycare institutions and facilities, adult congregate living facilities, and nursing homes which or who have voluntarily assumed or been assigned the care of an aged or infirmed person or disabled adult, or have assumed voluntary residence with an aged or infirmed person or disabled adult.
C. For the purposes of this Section, an aged person is any individual sixty years of age or older.
....
*621 The term "intentional" as used in this statute refers to a general criminal intent to mistreat or neglect and does not require an intent to cause unjustifiable pain and suffering. State v. Scott, 582 So.2d 864 (La.App. 5th Cir.1991), writ denied, 584 So.2d 1171 (La.1991). General criminal intent is present whenever there is specific intent, and also when the circumstances indicate that the offender, in the ordinary course of human experience, must have adverted to the prescribed criminal consequences as reasonably certain to result from his act or failure to act. La. R.S. 14:10(2). State v. Echeverria, 2002-2592 (La.App. 1st Cir.6/27/03), 858 So.2d 632.
Our supreme court in State v. Brenner, 486 So.2d 101 (La.1986), discussed the meaning of neglect or "criminal neglect" with reference to the statute on cruelty to the infirm:
Here, the word neglect is preceded by "or" and indicates that the "criminally negligent" qualifying words apply to neglect as well as mistreatment.
La. R.S. 14:12, which defines criminal negligence, provides:
Criminal negligence exists when, although neither specific nor general criminal intent is present, there is such disregard of the interest of others that the offender's conduct amounts to a gross deviation below the standard of care expected to be maintained by a reasonably careful man under like circumstances.
Criminal negligence requires a gross deviation below the standard of care expected to be maintained by a reasonably careful man under like circumstances. It calls for substantially more than the ordinary lack of care which may be the basis of tort liability, and furnishes a more explicit statement of that lack of care which has been variously characterized in criminal statutes as "gross negligence" and "recklessness." State v. Brenner, supra; State v. Scott, supra.
In State v. Comeaux, 319 So.2d 897 (La. 1975), the supreme court held:
"Mistreatment" is in common usage and is equated with "abuse".... In our opinion, "mistreatment" has a commonly understood meaning.
The supreme court in State v. Brenner, supra, discussed the meaning of the phrase "unjustifiable pain and suffering," stating that:
Unjustifiable is a term of limitation intended to distinguish that pain and suffering which is an inevitable consequence of care and treatment from that which is not justified by medical needs.
La. R.S. 14:27, in pertinent part, defines "attempt" as follows:
A. Any person who, having a specific intent to commit a crime, does or omits an act for the purpose of and tending directly toward the accomplishing of his object is guilty of an attempt to commit the offense intended; and it shall be immaterial whether, under the circumstances, he would have actually accomplished his purpose.
....
C. An attempt is a separate but lesser grade of the intended crime; and any person may be convicted of an attempt to commit a crime, although it appears on the trial that the crime intended or attempted was actually perpetrated by such person in pursuance of such attempt.
A jury has the prerogative to compromise and render a lesser verdict whenever it could have convicted as charged. State v. Mitchell, 35,970 (La. App.2d Cir.5/08/02), 818 So.2d 807; State v. Bryant, 33,078 (La.App.2d Cir.3/1/00), 754 So.2d 387. Even if an offense is legislatively *622 designated as responsive by La. C. Cr. P. art. 814, a defendant may timely object to an instruction on a responsive verdict on the basis that the evidence does not support that responsive verdict. La. C. Cr. P. art. 814(C). State v. Mitchell, supra; State v. Johnson, 30,078 (La. App.2d Cir. 12/10/97), 704 So.2d 1269, writ denied, 98-0382 (La.6/26/98), 719 So.2d 1054. Absent a contemporaneous objection, however, a defendant cannot complain if the jury returns a legislatively-approved responsive verdict, even where there is insufficient evidence to support such a verdict, provided that the evidence is sufficient to support the charged offense. State v. Schrader, 518 So.2d 1024 (La. 1988), cert. denied, 498 U.S. 903, 111 S.Ct. 265, 112 L.Ed.2d 221 (1990); State v. Mitchell, supra. In this instant case, the record does not indicate that a contemporaneous objection was made.

Evidence and Testimony
Ms. Johnnie Scott had lived at her Griffin Street home in Monroe since 1973 with her family composed of her biological son, 49-year-old Stanley Scott, the defendant, 53-year-old Barbara Smith, and two grandchildren, ages 27 and 20. Stanley and Smith described their mother as a "real independent woman" who insisted on having her way and who ruled the household. Everything in the home belonged to Ms. Scott. She liked to accumulate things and nothing could be touched or thrown out without her permissionincluding mail from the 60's and 70's. Ms. Scott began sleeping on the couch a few months after moving into the Griffin Street home so that one of her grandchildren could have the back room. After her retirement at age 65, she enjoyed sitting in the yard and/or porch drinking beer and smoking cigarettes. The defendant would cash her mother's checks, pay the bills and give her the rest of the money. The defendant and Stanley would purchase their mother's necessities.
Ms. Scott's health began to decline in September 2001. Stanley observed that his mother began to spend more time on the couch and less time out on the porch. However, she was still able to move about the house. In the beginning of November, Ms. Scott, although still somewhat mobile, slowed down considerably. She stopped drinking and smoking. According to the defendant, her mother became completely immobile during the latter part of November 2001. Ms. Scott used a bucket as a bedpan, although this was a long-standing practice for her. The defendant and Stanley urged their mother to seek medical attention, but she declined. Stanley also asked some neighbors to talk his mother into going to the doctor, but she refused.
On December 28, 2001, Stanley called an ambulance service to transport his mother to the hospital because of her decreased appetite and lack of mobility. Ms. Scott refused to go. Paramedic Stacey Hill described Ms. Scott, who was sitting on the couch, as alert and awake. When asked, she reported that she had no complaints. Hill took Ms. Scott's vital signs. Her blood pressure was slightly elevated and her pulse rate was a bit high. Hill explained to Ms. Scott the dangers of dehydration, which she appeared to understand. Hill did not observe any noticeable bedsores, but only checked Ms. Scott's upper body. Hill saw no feces or urine on her. Because Ms. Scott was alert, Hill could not transport her against her will. The ambulance service left because Ms. Scott refused to be transported for treatment.
On February 2, 2002, approximately 35 days later, an ambulance was again summoned to Ms. Scott's residence. Paramedic Lisa Winborne and Emergency Medical *623 Technician Johnathan Cory Rinado of American Medical Response responded to the call. Winborne observed that the 83-year-old Ms. Scott was on the couch looking "real sick." Stanley told the ambulance personnel that his mother had been on the couch for three months. Rinado described Ms. Scott as unclean and as having a strong, foul odor of feces and urine. Stanley encouraged his mother to go in the ambulance. Initially, Ms. Scott acted belligerent and refused to be takenshe slapped at the ambulance personnel a couple of times, knocking Rinado's glasses off his face. However, Winborne eventually convinced Ms. Scott that she needed to go to the hospital and she finally agreed. When the ambulance personnel picked Ms. Scott up from the couch, they observed feces, urine, pus, and blood in the couch. The couch looked "pretty bad." Ms. Scott's gown was soaked with feces and urine. Rinado observed that she had decubitus ulcers, including a "pretty bad" sacral decubitus ulcer. After the ambulance personnel put Ms. Scott on the stretcher, she became more relaxed. Once inside the ambulance, Rinado observed that Ms. Scott's demeanor made a complete turnaround. She became calm and sweet. Rinado described Ms. Scott as "quite a nice lady." As the ambulance prepared to leave the residence, Rinado noticed that the couch had already been taken out of the house.
Ms. Scott was taken by ambulance to E.A. Conway Hospital in Monroe. Emergency room nurse Randy Steve Adcock described Ms. Scott's medical condition upon arrival at the hospital as "serious or critical." She was barely responsive and seriously dehydrated. Adcock described her hygiene as "pitiful." She had a foul odor, and was covered from head to toe with urine and feces, both dried and fresh. Adcock opined that "this is not something that happens in one day's time." Ms. Scott had multiple scars on her leg (like healed decubitus ulcers), one decubitus ulcer on her hip and a big, gaping, fresh wound on her leg. She had to be bathed before she was treated. Because of Ms. Scott's condition and injuries, Adcock made a complaint of suspected elder abuse with the Monroe Police Department.
Monroe Police Officers Emmett M. Mapps, Jr. and Terrance Irvin responded to the call. When Officer Mapps arrived at the hospital, he observed that Ms. Scott was moaning and appeared to be in too much pain to talk. According to Officer Irvin, she screamed loudly from pain when the nurse rolled her on her side to show the officers her wounds. Officer Mapp photographed Ms. Scott's wounds.
An investigation of Ms. Scott's house and the discarded couch followed. Officer Irvin described the house as the filthiest he had ever seen-it was full of trash and clothes. The couch and cushions had a strong odor of feces and urine. One of the cushions had some flesh on it. The couch itself had an exposed spring. Officer Mapp concluded that the gaping wound on Ms. Scott's leg was caused by the exposed spring from the couch.
Thomas Staten, an investigator for the Monroe Police Department, described the condition of the house as "deplorable." In addition to the strong odor and scattered clothing, Detective Staten noted that there was uncooked food on the stove and the bathroom looked filthy and unsanitary.
A subsequent psychiatric evaluation of Ms. Scott was conducted by Dr. Alfredo E. Torres, who concluded that she lacked decisional capacity and that every decision should be made by the family caregivers. Debra Pruett, a social worker with the Office of Elderly Affairs, also evaluated Ms. Scott. She aided in having her interdicted and placed in a nursing home upon *624 release from the hospital. Ms. Scott later died in the nursing home.[1]
On March 4, 2002, the defendant and Stanley were charged by bill of information with one count of cruelty to the infirm. During the subsequent jury trial, the defense presented several witnesses. The defendant's cousin, Jackie Ricks, testified that Ms. Scott was a feisty little woman who had to have her way. Ricks stated that she visited Ms. Scott on the day she was taken to the hospital. When Ricks tried to get her to get up off the couch, Ms. Scott "pulled a knife" and told Ricks to leave her alone. Ricks told Stanley that his mother needed to go to the hospital and called the paramedics. Ricks stated that she did not notice any foul odors on the couch.
The defendant testified on her own behalf. She admitted having some nurse's aide training, but she did not complete the course. She "sat" for about ten persons, some of whom were bedridden. The defendant was aware that her mother was sick and unable to move around, so the defendant never left her unattended. The defendant thought that her mother needed to go to the doctor, but she refused to go. The defendant stated that by late November 2001, Ms. Scott could no longer do anything for herselfshe could no longer walk or feed herself. The defendant fed her mother soups, soft drinks, and nutritional drinks.
The defendant stated that her mother stayed on the couch from November to February. The defendant only moved her once, and then only to a seated position. The defendant tried to move her other times, but her mother was "dead weight" and she couldn't move her by herself.
During the latter part of November 2001, the defendant bought her mother some disposable diapers. The defendant related that Ms. Scott would "holler" and fight her when she tried to change the diapers, and she was only able to get one diaper completely on her mother. The defendant stated that she was unable to clean, change or turn her mother on the couch, and Ms. Scott refused to go to the bed where the defendant could change and clean her easily. The defendant admitted that she was only able to fully clean her mother once, but she tried to clean her often by wiping where she could reach. The defendant asserted that she never smelled the foul odors, but stated that her bronchitis probably affected her sense of smell.
The defendant further related that her mother kept a knife with her at all times, but never threatened her with it. The defendant asserted that she could not ignore her mother's "screaming and hollering" when she tried to clean her because she was taught that you must "mind" an old person and should not force them to do anything.
Stanley Scott testified and corroborated the defendant's testimony that their mother was strong-willed and controlled the household. He reiterated that Ms. Scott refused to go to the hospital and told him that, "If you make me go, I'll never forgive you." He stated that he also tried to clean her, but that she resisted. Stanley stated that on the first occasion the ambulance was summoned, he was told that if the ambulance was called again, they would charge him for coming to the house.

*625 Discussion
The defendant argues that the evidence was insufficient to support her conviction. This argument is without merit.
The defendant's action in allowing her mother to remain on a couch for more than a month, while lying in her own filth, satisfies the elements of cruelty to the infirm. Because the record supports a finding of guilt to the offense charged, the jury did not err in finding the defendant guilty of the lesser offense of attempted cruelty to the infirm.
In the case sub judice, it is not denied that the victim was 83 years old and therefore an "aged person" pursuant to La. R.S. 14:93.3(C). It is also not contested that the defendant qualified as a "caregiver" as defined in La. R.S. 14:93.3(B). The defendant only disputes that she intentionally or in a criminally negligent manner mistreated or neglected the victim, and urges that her particular circumstances be taken into consideration. Considering that the appellate court does not assess the credibility of witnesses or reweigh evidence, a review of the record reveals that the defendant's conviction should stand.
We are aware that the record shows that the defendant's mother was very strong-willed and controlled her household. The defendant and her brother had been brought up to respect and obey their mother's wishes. When their mother's health began to fail, the defendant tried to provide for her needs. However, Ms. Scott resisted all attempts to help her. As late as December 2001, when the first ambulance was called to the house, the ambulance workers did not observe a hygiene problem and determined that Ms. Scott was competent to refuse medical care. The ambulance workers informed the family that if they were summoned to the house again, they would be charged for the call.
However, for the next 35 days, the defendant and her brother allowed their mother to lie in her own filth. Even though they testified that they made attempts to clean her and that those attempts were resisted, they had a duty to intervene on Ms. Scott's behalf and insist that she either submit to their efforts at proper sanitation or go to a hospital or nursing home to be cared for by others.
The state contends that, due to the defendant's training as a nurse's aide, she knew or should have known the importance of turning her mother frequently in order to prevent bedsores. While the defendant acknowledged that she knew this was important, she explains that her mother simply refused to cooperate. Given the defendant's training, her failure to provide the proper care for her mother in the home or obtain appropriate aid elsewhere satisfies the elements of cruelty to the infirm.
As to general criminal intent, the circumstances show that the defendant, in the ordinary course of human conduct must have adverted to the unjustifiable pain and suffering caused to her mother by the defendant's failure to properly attend to her needs. Also, the conduct of the defendant meets the definition of criminal neglect in that the defendant's behavior constituted such a disregard of her mother's interests as to be a gross deviation below the standard of care expected to be maintained by a reasonably careful person under like circumstances.
Although the defendant's predicament was obviously a difficult one, her respect for and deference to her elder's wishes should have yielded to her professional training and experience, if not her common sense, and proper care and treatment should have been provided for her mother. The defendant also greatly benefitted by *626 the jury's great restraint in finding her guilty of the lesser crime of attempted cruelty to the infirm, as well as the lenient sentence imposed by the trial court. Accordingly, based upon these facts, we find that the evidence was sufficient to support the verdict.

CONCLUSION
For the foregoing reasons, we affirm the conviction and sentence of the defendant, Barbara Smith, for attempted cruelty to the infirm.
AFFIRMED.

APPLICATION FOR REHEARING
Before BROWN, WILLIAMS, STEWART, GASKINS, and LOLLEY, JJ.
Rehearing denied.
NOTES
[1] Stanley testified that his mother continued to fight her caregivers while at the nursing home.