NOT DESIGNATED FOR PUBLICATION

STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

11-725

STATE OF LOUISIANA

VERSUS

H. O.

**********

APPEAL FROM THE
FIFTEENTH JUDICIAL DISTRICT COURT
PARISH OF LAFAYETTE, NO. CR 125838
HONORABLE EDWARD D. RUBIN, DISTRICT JUDGE

**********

J. DAVID PAINTER
JUDGE

**********

Court composed of J. David Painter, Shannon J. Gremillion, and Phyllis M. Keaty, Judges.

AFFIRMED WITH INSTRUCTIONS.

Edward K. Bauman, Attorney at Law
Louisiana Appellate Project
P. O. Box 1641
Lake Charles, LA 70602-1641
COUNSEL FOR DEFENDANT-APPELLANT:
        H. O.

Michael Harson, District Attorney
J. N. Prather, Assistant District Attorney
Fifteenth Judicial District
Courthouse Building
P. O. Box 3306
Lafayette, LA 70502
COUNSEL FOR THE STATE OF LOUISIANA

**PAINTER, Judge.**

Defendant, H. O.,[1] appeals his conviction for attempted cruelty to a juvenile, asserting that the evidence was insufficient to sustain the verdict. For the reasons that follow, we affirm his conviction.

## FACTS AND PROCEDURAL HISTORY

After an evening of ingesting cocaine, Defendant began experiencing chest pains and was taken to the hospital in an ambulance, along with his girlfriend, H. H., and their one-month-old child. When the couple got out of the ambulance at the hospital, Defendant was carrying the child in a car carrier. The couple had been fighting in the ambulance and continued to do so at the hospital. Twice, Defendant threw the car carrier to the ground with the child still in it. After the police arrived, the child was taken into the emergency room and examined. The child sustained no injuries.

On September 3, 2009, Defendant was charged with one count of cruelty to a juvenile, a violation of La.R.S. 14:93. Defendant chose to be tried by a judge, and on December 14, 2010, he was found guilty of attempted cruelty to a juvenile, violations of La.R.S. 14:27 and 14:93. The trial court sentenced Defendant to five years at hard labor, with credit for time served. Defendant did not file a motion to reconsider the sentence.

Defendant has perfected a timely appeal, asserting that the evidence was insufficient to sustain the verdict. For the reasons that follow, we affirm his conviction.

## DISCUSSION

*Errors Patent*

In accordance with La.Code Crim.P. art. 920, all appeals are reviewed for errors patent on the face of the record. After reviewing the record, we find that there is one

---

[1] In accordance with La.R.S. 46:1844(W), we use the initials of the parties, where necessary, to protect the identity of the victim.

error patent in that the record does not indicate that the trial court advised Defendant of the prescriptive period for filing post-conviction relief as required by La.Code Crim.P. art. 930.8. Thus, the trial court is directed to inform Defendant of the provisions of Article 930.8 by sending appropriate written notice to Defendant within ten days of the rendition of this opinion and to file written proof in the record that Defendant received the notice. *See State v. Roe*, 05-116 (La.App. 3 Cir. 6/1/05), 903 So.2d 1265, *writ denied*, 05-1762 (La. 2/10/06), 924 So.2d 163.

*Sufficiency of the Evidence*

Defendant argues that the State failed to prove beyond a reasonable doubt that he had the specific or general intent to mistreat the child; therefore, the evidence was insufficient to sustain the verdict of attempted cruelty to a juvenile.

> When the issue of sufficiency of evidence is raised on appeal, the critical inquiry of the reviewing court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); S*tate ex rel. Graffagnino v. King*, 436 So.2d 559 (La.1983); *State v. Duncan*, 420 So.2d 1105 (La.1982); *State v. Moody*, 393 So.2d 1212 (La.1981). It is the role of the fact finder to weigh the respective credibility of the witness. Therefore, the appellate court should not second-guess the credibility determination of the trier of fact beyond the sufficiency evaluations under the *Jackson* standard of review. See *King*, 436 So.2d 559, citing *State v. Richardson,* 425 So.2d 1228 (La.1983).

*State v. Lambert*, 97-64, pp. 4-5 (La.App. 3 Cir. 9/30/98), 720 So.2d 724, 726-27.

The offense of cruelty to a juvenile entails "[t]he intentional or criminally negligent mistreatment or neglect by anyone seventeen years of age or older of any child under the age of seventeen whereby unjustifiable pain or suffering is caused to said child." La.R.S. 14:93(A)(1). Defendant was found guilty of attempted cruelty to a juvenile. The attempt statute provides that "[a]ny person who, having a specific intent to commit a crime, does or omits an act for the purpose of and tending directly toward the accomplishing of his object is guilty of an attempt to commit the offense

intended; and it shall be immaterial whether, under the circumstances, he would have actually accomplished his purpose."

Aaron McNair, a corporal with the Lafayette City Police Department, testified that on August 4, 2009, at approximately 4:00 a.m., he and another corporal were called to Our Lady of Lourdes Hospital due to a disturbance "between a male and a female, and the caller advised that the male had possibly thrown a baby onto the ground." Upon arrival, he encountered Defendant holding a child car carrier and a white female, H.H., holding the baby. Corporal McNair testified that the couple was still arguing. While he attended to the two, Corporal Ogleby talked with the hospital's security guard, who had called in the disturbance. When Corporal Ogleby returned, he informed Corporal McNair that Defendant was seen throwing the baby to the ground. Defendant and H.H. were *Mirandized* at that time.

Corporal McNair stated that the baby was in his mother's arms when he arrived and did not appear to be upset or in any kind of distress. However, because the baby was not crying, the corporal was concerned. He took H.H. and the baby into the emergency room of the hospital, and the baby was examined by a doctor. While they waited, H.H. indicated to Corporal McNair that she and Defendant were arguing because he had been using cocaine all night long and had hit her. Corporal McNair testified that he observed that her nose was bleeding. Corporal McNair further testified that the examining doctor did not find anything wrong with the child.

Brian Lejeune was a security guard for the hospital. He testified that in the early morning, he was summoned to the ambulance by a paramedic because of the arguing couple. He stated that as he watched, Defendant got out of the back of the ambulance with the car carrier, holding the baby in one hand and a diaper bag in the other, and that the couple began walking away from the ambulance as they argued. Lejeune testified that he was concerned for the baby, so he followed them.

Lejeune characterized their argument as very animated. According to Lejeune, Defendant "spike the baby. . . He threw it down like a football." Lejeune testified that he stayed about thirty yards behind the couple and admitted that he lost sight of them for a few minutes. However, Lejeune also testified that he never saw the baby exchange hands, and although he could not actually see the baby in the carrier from that distance, when Defendant threw the carrier down, Lejeune could see that H.H. did not have the baby in her arms. Lejeune testified that Defendant picked up the car carrier and threw it down again. Lejeune stated that he stayed and watched the couple until the police arrived, then he went inside the hospital. He testified that he never heard the baby cry.

Catherine Guidry testified that she was working the nightshift on the night in question and was standing outside, taking a break, when the ambulance pulled up. She watched the couple get out with the baby. They were arguing as they walked by her. Lejeune was a short distance behind, and she began following them with Lejeune. She stated that at one point, Defendant put the baby down and struck H.H. on the head. Defendant again picked the car carrier up and threw it to the ground. She stated that the baby appeared to be wrapped in a blanket and rolled across four lanes of the roadway. Guidry said that Defendant retrieved the baby and put him back into the car carrier. She said that H.H. kept asking for the baby. "She asked him to give her her baby because he was going to hurt the baby. And he told her she wasn't deserving of the baby because you're [sic] nothing but poor white trash." Guidry further testified that Defendant threw the car carrier down again, and that was when Guidry suggested that they call the police. Shortly thereafter the police arrived, and Defendant handed the baby to H.H. Guidry never heard the baby cry.

H.H. testified that Defendant was her boyfriend and that the baby, just over one-month old at the time, was their child. She had called the ambulance when Defendant thought he "was having a heart attack because he did some powdered

4

cocaine and started tripping." She said that Defendant had the car carrier when they got out of the ambulance. She followed after him. H.H. testified:

> Every time he would turn around and put his hand in my face, he would put the baby down. That happened two times. The first time, I didn't [sic] a chance to grab the baby out of the car seat. But the second time, I did. . . . So I unstrapped the baby and took him in my arms with the blanket.

She stated that although Defendant did throw the carrier down, she had the baby when he did so. H.H. testified that she snatched the baby up because she knew that as long as she was holding the baby, Defendant would not hit her. Further, she stated that even though she looked around for someone to help her, she saw no one watching them that night. H.H. testified that she had five prior convictions: simple burglary, two forgeries, theft of a vehicle, and illegal possession of stolen things.

Defendant also testified. His description of the events of that early morning was essentially the same as H.H.'s. Defendant testified that when they got out of the ambulance, he was "angry, mad." He stated that he did throw the carrier down, but he insisted that the baby was not in the car carrier when he threw it down to the ground. He also admitted that he had three prior convictions for violent crimes: an aggravated battery in 1991, simple battery in 2007, and battery on a police officer in 2009. The following discussion took place between the trial court and Defendant:

> THE WITNESS: I could say something, Your Honor?
>
> THE COURT: Yes.
>
> THE WITNESS: At thirty-four (34) days old if I would have down [sic] what they said I would have do [sic], the child would have been either dead or bones would have been broken on him or something.
>
> THE COURT: Why you say that? I'm just curious.
>
> THE WITNESS: Because at that age—
>
> THE COURT: Uh-huh (yes).
>
> THE WITNESS: -- a baby can't take no pressure from nothing, no hits, no nothing. And what they are accusing me of doing, if I would have do

5

[sic] any of that, it would have show -- physical evidence would have showed that I did that.

THE COURT: Well, I'm curious. By your own admission, when you got out of the ambulance, the baby was in the car seat --

THE WITNESS: Yes.

THE COURT: -- and you were carrying the car seat as you all left the hospital --

THE WITNESS: Yes, sir.

THE COURT: -- and all that pretty much is what Mr. Lejeune said and what Ms. Guidry said.

THE WITNESS: But they [sic] saying that I, Your Honor, basically saying that I spiked the carrier like a football or they [sic] saying I threw it down. I'm going to admit that I did have the baby seat in my arm because I was carrying my son and I was carrying the diaper bag.

THE COURT: I understand, but you also admitted that you threw the car seat into the street --

THE WITNESS: Yes, sir.

THE COURT: -- possibly twice --

THE WITNESS: But the child wasn't --

THE COURT: -- but you're saying that the baby was not in there.

THE WITNESS: He was not, Your Honor.

During Defendant's presentation, Lejeune was called to the stand again, and he agreed that he never saw the baby roll out of the carrier and across the roadway.

Defendant argues that he cannot be convicted of the nonresponsive verdict for the reason that the "attempt" is a specific intent element, and he argues that the State failed to prove specific or general intent. As for criminal negligence, Defendant points to *State v. Cortez*, 96-859, p. 15 (La.App. 3 Cir. 12/18/96), 687 So.2d 515, 524, wherein this court reversed a conviction of attempted cruelty to a juvenile, holding that the conviction could not stand because the State failed to prove specific or general criminal intent and that "it is a legal impossibility for someone to be guilty of attempted criminal negligence."

6

In *Cortez*, this court began its analysis noting that the trial court had instructed the jury that it could find the defendant guilty of the nonresponsive offense of attempted cruelty to a juvenile. This court, in *Cortez*, stated:

> At no time did the defense object to the trial court's charge to the jury. *Assuming for the moment* that the responsive verdict of attempted cruelty to a juvenile is legislatively designated as responsive pursuant to La.R.S. 14:27, we must first examine whether there was sufficient evidence presented at trial to find Ms. Cortez guilty of the greater offense, namely, cruelty to a juvenile. In *State ex rel. Elaire v. Blackburn*, 424 So.2d 246, 251-52 (La.1982), *cert. denied,* 461 U.S. 959, 103 S.Ct. 2432, 77 L.Ed.2d 1318 (1983), the Louisiana Supreme Court held:

>> [I]f the defendant does not enter an objection [to an instruction on a responsive verdict on the basis that the evidence does not support that responsive verdict] (at a time when the trial judge can correct the error), then the reviewing court may affirm the conviction if the evidence would have supported a conviction of the greater offense, whether or not the evidence supports the conviction of the legislatively responsive offense returned by the jury.

>> It would be unfair to permit the defendant to have the advantage of the possibility that a lesser "compromise" verdict will be returned (as opposed to being convicted of the offense charged) and then to raise the complaint for the first time on appeal, that the evidence did not support the responsive verdict to which he failed to object. Therefore, at least when the defendant fails to interpose a timely objection to a legislatively responsive verdict, this court will not reverse the conviction if the jury returns such a verdict, whether or not that verdict is supported by the evidence, as long as the evidence is sufficient to support the offense charged.

> Pursuant to *Elaire*, therefore, we will first review the record for a determination of the sufficiency of the evidence related to the greater offense of cruelty to a juvenile. If we find that the evidence presented at trial would have been sufficient to sustain a conviction of cruelty to a juvenile, our analysis ends and we must affirm. If, however, we determine that there was insufficient evidence to uphold a guilty verdict for the greater offense, we will then review the sufficiency of the evidence for the responsive verdict of attempted cruelty to a juvenile.

*Id*. at 519.

In the current case, because it was a judge trial, the record does not contain any proposed jury instructions. However, defense counsel did not object when the trial court found Defendant guilty of attempted cruelty to a juvenile. Moreover, defense

counsel even referred to the possibility of a conviction of attempted cruelty to a juvenile in his closing argument.

To prove a defendant guilty of cruelty to a juvenile, the State has to show that the defendant was over the age of seventeen and that the victim was under the age of seventeen. The State must also establish that the defendant intentionally mistreated or neglected the victim or was criminally negligent in his mistreatment or neglect of the victim. Finally, the State has to prove unjustifiable pain and suffering.

> The term "intentional" refers to general criminal intent to mistreat or neglect and does not require an intent to cause the child unjustifiable pain and suffering. *State v. Schultz*, 01-995 (La.App. 5 Cir. 4/10/02), 817 So.2d 202, 208, *writ denied*, 02-1320 (La.11/27/02), 831 So.2d 270. General criminal intent is "present whenever there is specific intent, and also when the circumstances indicate that the offender, in the ordinary course of human experience, must have adverted to the prescribed criminal consequences as reasonably certain to result from his act or failure to act." LSA-R.S. 14:10(2); *Id.*

> An alternative to proving defendant had general criminal intent to mistreat or neglect the child thereby causing the child unjustifiable pain and suffering is to prove that defendant was criminally negligent in his mistreatment or neglect of the child. Criminal negligence "exists when, although neither specific nor general criminal intent is present, there is such disregard of the interest of others that the offender's conduct amounts to a gross deviation below the standard of care expected to be maintained by a reasonably careful man under like circumstances." LSA-R.S. 14:12; *State v. Jackson*, 98-1254 (La.App. 5 Cir. 3/30/99), 733 So.2d 657, 661. Criminal negligence is essentially a negative. Rather than requiring the accused intended the consequences of his actions, criminal negligence is found from the accused's gross disregard for the consequences of his actions. *Id.*

> Thus, to carry its burden of proof the State must show that defendant either intentionally mistreated or neglected C.P. or was criminally negligent in his mistreatment or neglect of C.P. Mistreatment is equated with "abuse" and has a commonly understood meaning. *State v. Comeaux*, 319 So.2d 897, 899 (La.1975).

*State v. Chacon*, 03-446, pp. 4-5 (La.App. 5 Cir. 10/28/03), 860 So.2d 151, 153.

In the current case, there was no dispute regarding the age elements of the offense. Further, we find that the elements of "intentional" or "criminal negligence" were satisfied by the act of throwing a car carrier down to the ground with the baby still in it. Two witnesses testified that they watched Defendant throw down the carrier

8

two times. One witness testified that Defendant "spiked" the carrier like a football. The other witness stated that the baby rolled out of the carrier and across the roadway. As noted above, there is no requirement that there be an intent to cause the child unjustifiable pain and suffering, only that a defendant, in the ordinary course of human experience, has adverted to the prescribed criminal consequences as reasonably certain to result from his act or failure to act. Furthermore, in the current case, it cannot be argued that Defendant's conduct did not amount to a gross deviation below the standard of care expected to be maintained by a reasonably careful man under like circumstances.

In *Chacon*, the defendant struck the eight-year-old victim on the arm, twice, with a closed fist. Among other defenses, he argued that the victim did not cry nor was knocked off balance; accordingly, there was no unjustifiable pain or suffering. The fifth circuit did not agree:

> The force of the blow left a severe bruise on C.P.'s arm in the shape of a fist. The trial judge specifically found that, "prints upon this child's arm appear to be that of a fist." The mere fact C.P. testified that he did not cry when defendant struck him or the fact he was not thrown off balance from the force of the blows is not determinative of whether C.P. suffered unjustifiable pain and suffering. A bruise of the severity and magnitude exhibited by the photographs clearly demonstrates that unjustifiable pain and suffering were inflicted upon C.P.

*Id.* at 154.

Furthermore, this court has held that a victim need not have sought medical attention in order to find unjustifiable pain and suffering. *See State v. C.S.D.*, 08-877 (La.App. 3 Cir. 2/4/09), 4 So.3d 204.

In *State v. Browhow*, 41,686 (La.App. 2 Cir. 12/13/06), 945 So.2d 890, the defendant was charged with cruelty to the infirm and convicted of attempted cruelty to the infirm, which was upheld by the second circuit. Browhow worked as a personal care attendant in a facility that cared for Alzheimer's patients. On one very cold night, one of the non-ambulatory patients was being particularly unruly. Browhow

pushed the elderly patient's wheelchair outside of the building and left her there, clothed only in her pajamas, for more than fifteen minutes. On appeal, the defendant alleged that there was insufficient evidence to sustain the verdict because the State failed to prove that the victim experienced any pain or suffering as a result of the defendant's actions. While discussing the sufficiency of the evidence pursuant to the *Jackson* standard, the second circuit stated:

> The evidence viewed under the aforementioned standard of review sufficiently proved the defendant intended to mistreat the victim, an aged person, by placing her outside in freezing temperatures, clothed in nothing more than pajamas, for a period of at least 15 minutes. It also is a reasonable inference that this conduct would have caused unjustifiable pain or suffering to the victim. However, whether or not such pain or suffering was actually proven is not relevant to whether the evidence supports a conviction for attempted cruelty to the infirm. The evidence need only be sufficient to prove that the defendant actively desired to cause the proscribed criminal consequences to follow her act or failure to act and that she committed or omitted an act for the purpose and tending directly toward the accomplishing of that object. The despicable actions of the defendant establish specific intent to mistreat the victim. Furthermore, it sufficiently establishes her intent to cause the proscribed pain or suffering to the victim, which pain or suffering would not have been an inevitable consequence of the victim's care and treatment.

*Id.* at 894.

The second circuit found specific intent to commit harm in *Browhow*. Specific criminal intent may be inferred from the circumstances present in the case and the actions of the defendant. *State v. Carroll,* 95-859 (La.App. 3 Cir. 1/31/96), 670 So.2d 286. In *State v. Hicks*, 10-19 (La.App. 3 Cir. 6/2/10), 38 So.3d 1262, *writ denied,* 10-1548 (La. 2/11/11), 56 So.3d 998, specific intent to commit second degree battery was evidenced by testimony that after the defendant hit the victim and the victim fell to the ground, the defendant continued to beat the victim for about another minute. The supreme court upheld a conviction for attempted cruelty to a juvenile in *State v. Freeman,* 409 So.2d 581 (La.), *cert. denied*, 459 U.S. 845, 103 S.Ct. 100 (1982), where the defendant was seen whipping the infant with a belt. In *State v. Smith*, 38,154 (La.App. 2 Cir. 4/14/04), 870 So.2d 618, the second circuit affirmed a

conviction for attempted cruelty to the infirm and stated: "Because the record supports a finding of guilty to the offense charged, the jury did not err in finding the defendant guilty of the lesser offense of attempted cruelty to the infirm." *Id.* at 625.

At trial, the State, during closing arguments, asserted that Defendant intended to hurt the baby to get back at the baby's mother. While motive is not a necessary element of the offense of attempted cruelty to a juvenile, a motive may properly be considered as a circumstance mitigating for specific intent. *See State v. Mart*, 352 So.2d 678 (La.1977). There was sufficient evidence that Defendant was extremely angry with the baby's mother. There was testimony that she begged him to give her the baby, but he refused to do so. Thus, we find that the evidence in this case was sufficient to sustain the verdict in this case.

## DECREE

For the foregoing reasons, Defendant's conviction is affirmed. The trial court is ordered to inform Defendant of the provisions of La.Code Crim.P. art. 930.8 by sending appropriate written notice to Defendant within ten days of the rendition of this opinion and to file written proof in the record that Defendant received the notice.

**AFFIRMED WITH INSTRUCTIONS.**