582 So.2d 864 (1991)
STATE of Louisiana
v.
Alfred SCOTT.
No. 91-KA-44.
Court of Appeal of Louisiana, Fifth Circuit.
June 5, 1991.
Writ Denied September 20, 1991.
Bruce G. Whittaker, Indigent Defender Bd., Gretna, for defendant/appellant.
James S. Weidner, Dorothy A. Pendergast, Asst. Dist. Attys., (Louise Korns, of counsel), Office of the Dist. Atty., Gretna, for the State.
Before BOWES, GAUDIN and GRISBAUM, JJ.
BOWES, Judge.
The defendant, Alfred Scott, was charged by bill of information filed on October 6, 1986 with six counts of cruelty to the infirm in violation of LSA-R.S. 14:93.3.[1] After pleading not guilty at arraignment, the defendant proceeded to trial, following which the jury returned a verdict of guilty as charged on counts 1, 2, 3 and 5 and not guilty on counts 4 and 6. The trial court sentenced the defendant to one year in parish prison on each count with the sentences running consecutively and fined the defendant $10,000 plus costs. Defendant appeals his conviction.

FACTS
Vanco Human Services, Inc., a private corporation, operated a home for mentally retarded individuals under a state license in Kenner, Louisiana. The defendant worked at the home as an Assistant Home Manager assisting the six "clients" of the home, Tyree Tullos, Dale Hebert, Lionel Buxton, Kent Taylor, Edward Bush and Robert Vaughn. None of the clients could verbally communicate. Mr. Hebert, in addition to suffering from Down's Syndrome, is also blind and has a (unspecified) heart problem; Mr. Tullos had a seizure disorder (by the time of trial, he was deceased due to causes apparently unrelated to the charges); Mr. Taylor was blind; and Mr. Bush had a heart condition requiring a pace maker. All of the individuals were severely or profoundly retarded.
On the night of June 6, 1986, Janice Benn-King, an Assistant Home Manager who worked on the same shift as the defendant, *865 testified that she discovered burns on Dale Hebert and Tyree Tullos while bathing the two men. The burns were caused by an electric iron. A subsequent investigation by James Minto of the Department of Social Services also revealed other marks on the clients.
Ms. Benn-King testified that she immediately called for the defendant after discovering the burns. Upon observing the burns, the defendant said "Umm" and did not look upset. She further testified that she had bathed the two clients the previous night and at that time there were no burns on them.
In a statement given June 13, 1986, the defendant indicated that he first observed the burns on the clients on Friday night, June 6, 1986. Janice showed him the "mark" on Dale Hebert's shoulder and subsequently while bathing Tyree Tullos he noticed the burn on his leg.
At trial, the defendant testified that Janice called for him while she was bathing Dale Hebert. He proceeded into the bathroom where she pointed out the burn on Dale's shoulder. After examining the wound, the defendant commented: "It looked like a bruise to me, but I'm not a doctor, I can't say that it's a burn." He further testified that Janice did not call for him to inspect Tyree Tullos' burn and that he did not see his burn until the following Monday evening.
The state also presented direct evidence of what they contended was additional mistreatment by the defendant.
Ms. Benn-King testified that she witnessed the defendant hit Dale Hebert; that he "knocked" all of the clients around, punched Edward Bush and tied him up with a sheet; and pushed around Lionel Buxton, Dale Hebert and Tyree Tullos; however, she did not attempt to stop him because she was scared. She further testified that she supposed that the marks encircling the clients' wrists were caused by being tied up. She, as did all the employees of Vanco who testified, stated that no one was allowed to push the clients around, or hit them; they could not restrain the patients with anything other than their hands without a doctor's orders. She further stated she did not see anyone burn the victims, and did not know who did it.
James Minto, an investigator with the Department of Social Services, testified that the injuries were not confined to just Dale Hebert and Tyree Tullos. The other clients had "marks" on them which "appeared to be injuries" and, in particular, Edward Bush had very recent "marks" around his wrists.
Detective Wayne Danetta of the Kenner Police Department testified concerning two statements made by the defendant and admitted into evidence. In the second statement, Scott admitted that all the clients were being hit by the staff in the home, and that he himself participated. He slapped them a few times, and "used the baseball bat for reinforcement for lionel" [sic]; he tied up Mr. Bush with the sheet, although he knew the policy about using restraints on the clients. Later, he stated that he hit the clients with the bat on the legs or shoulders, with "light taps."
Several witnesses testified as to the defendant's reputation as a good and caring worker, and that they never witnessed any abuse by Scott. However, the Home Manager Donna Mitchell did testify that during a visit to K-Mart, Mr. Bush became agitated so Scott took him to the automobile and tied his hands with a sheet. She admitted that she and Scott falsified the report which indicated that Mr. Bush had been restrained with the hands, as required. She and Scott both signed the report.
At trial, the defendant testified that he tied the hands of Mr. Bush with a sheet to keep him from hurting himself, since Bush had become violent; this was the incident to which Scott had referred in his statement to police, and he had never tied any other clients. He further testified that he hit Lionel Buxton with the bat when that client became agitated and ran after defendant with the aluminum bat; in the struggle: "... he probably was hit a couple of times in us wrestling for me to take the bat away from him." However, the incident report introduced at trial showed only that "Lionel pushed the chair against the wall in *866 the living room and put another hole in the wall." Under "Action Taken", it was reported: "Asked Lionel to sit in another chair in another part of the living room." The statement was again signed by Scott and Mitchell. Scott further testified that he signed the statement given to police stating that he slapped the clients and hit them with a bat because he was upset and nervous. Other than the above detailed incidents, he stated that he never tied up nor hit the clients.

ANALYSIS
Without resort to what amounts to circumstantial evidence in regard to the burn injuries, it is clear that there was sufficient direct evidence given in court to support the jury's verdict.
LSA-R.S. 14:93.3 describes the crime of cruelty to the infirm with which crime defendant was charged and found guilty:
"A. Cruelty to the infirm is the intentional or criminally negligent mistreatment or neglect whereby unjustifiable pain or suffering is caused a person who is a resident of a nursing home, mental retardation facility, mental health facility, hospital or other residential facility required to be licensed or operated under the laws of this state or established by the laws of this state."
Appellant admits that the evidence of his tieing up the clients, using the aluminum baseball bat, and pushing and slapping them, is largely uncontroverted since it came from his own statements. However, he takes the position that the question still remains as to whether or not these actions constitute mistreatment which produced unjustifiable pain and suffering, claiming that there is no evidence that pain or suffering was caused by his actions.
In State v. Brenner, 486 So.2d 101 (La. 1986), our Supreme Court discussed the meaning of the phrase "unjustifiable pain and suffering" thusly:
"Because certain medical treatment necessarily results in pain and suffering, the phrase is qualified in the Louisiana statute to make it clear that only the infliction of unjustifiable pain and suffering is prohibited. See State v. Eich, 204 Minn. 134, 282 N.W. 810 (1938) which held that `unjustifiable' presented a sufficiently definite standard to pass constitutional muster, because the word `from common usage has a well known meaning'. Also see People v. Curtiss, 116 Cal.App.Supp. 771, 300 P. 801 (1931) which held that `unjustifiable', meaning that which could not be defended or vindicated or which was not exculpable, excusable, or authorizable under the circumstances, was sufficiently certain of meaning to provide a fixed standard of guilt. Also see Bludsworth v. State, 98 Nev. 289, 646 P.2d 558 (1982). Compare State v. Ballard, 341 So.2d 957 (Ala.Cr. App.1976), writ quashed 341 So.2d 962 (Ala.1976) and State v. Meinert, 225 Kan. 816, 594 P.2d 232 (1979) both of which involved the use of `unjustifiable' in different contexts."
The court also said:
"Unjustifiable is a term of limitation intended to distinguish that pain and suffering which is an inevitable consequence of care and treatment from that which is not justified by medical needs."
The court then also discussed the meaning of neglect or "criminal neglect" with reference to this statute:
"Here, the word neglect is preceded by `or' and indicates that the `criminally negligent' qualifying words apply to neglect as well as mistreatment."
LSA-R.S. 14:12 defines criminal negligence as follows:
"Criminal negligence exists when, although neither specific nor general criminal intent is present, there is such disregard of the interest of others that the offender's conduct amounts to a gross deviation below the standard of care expected to be maintained by a reasonably careful man under like circumstances."
Criminal negligence requires:
"A gross deviation below the standard of care expected to be maintained by a reasonably careful man under like circumstances.... It calls for substantially *867 more than the ordinary lack of care, which may be the basis of tort liability, and furnishes a more explicit statement of that lack of care which has been variously characterized in criminal statutes as `gross negligence' and `recklessness.'"

State v. Brenner, supra.

The term "intentional" as used in this statute refers to a general criminal intent to mistreat or neglect and does not require an intent to cause unjustifiable pain and suffering. See State v. Barnett, 521 So.2d 663 (La.App. 1 Cir.1988) and State v. Spencer, 486 So.2d 870 (La.App. 1 Cir. 1986).[2]
In State v. Comeaux, 319 So.2d 897 (La. 1975), the Supreme Court found as follows:
"`Mistreatment' is in common usage and is equated with `abuse.' See Webster's Third New International Dictionary, Verbo abuse. In our opinion, `mistreatment' has a commonly understood meaning."
There, too, the court found that "unjustifiable pain and suffering" is illuminated by reference to LSA-R.S. 14:18.[3]
We have considered the evidence in light of the appropriate statutory and jurisprudential standards, and conclude that, regardless of the defendant's testimony that he never intended to be cruel to the victims, nevertheless, his actions do, without doubt, in our opinion constitute cruelty to the infirm. Throughout the trial it was made clear that it was against regulations to use artificial restraints on the patients without medical permission. Also pushing and slapping the adult mentally retarded victims does not fall within any boundaries of "medical needs" and is, therefore, without justification. It is nothing less than cowardly abuse.
We find it appalling and completely unfeeling for defendant to suggest that hitting the victims with an aluminum baseball bat did not cause pain and suffering. The fact that the victims are so incapacitated as to preclude meaningful communication of their pain does not translate into an inability to feel it. Photos of the victims showed marks consistent with having been tied up, and other marks indicating that they had been struck.
"The duty to refrain from cruelty to the infirm residing in nursing homes or other facilities licensed and operated under the laws of the state extends to all who have a duty in regard to those residents. Those with a duty of care toward the infirm residents of licensed facilities, that is, those who are in some way responsible for their well-being, are required to refrain from criminally negligent mistreatment or neglect which inflicts unjustifiable pain and suffering. See People v. Harris, 239 Cal.App.2d 393, 48 Cal.Rptr. 677 (1966). Determining *868 which of those responsible for the patients are guilty of intentional or criminally negligent mistreatment or neglect is a matter to be determined by the trier of fact in each individual case.
There is a strong public policy in favor of protecting those who are infirm and defenseless from abuse.
. . . . .
Only when those responsible for care of the infirm inflict unjustifiable suffering, intentionally or with criminal negligence, is there criminal responsibility. See Bowers v. State, 38 Md.App. 21, 379 A.2d 748 (1977), affirmed on other grounds, 283 Md. 115, 389 A.2d 341 (1978)."

State v. Brenner, supra.

In evaluating the sufficiency of the evidence, the standard to be used by the appellate court is whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the defendant guilty beyond a reasonable doubt of every element of the crime charged. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Mussall, 523 So.2d 1305 (La.1988); State v. DiLosa, 529 So.2d 14 (La.App. 5 Cir.1988); writ den. 538 So.2d 1010 (La.1989).
Although the clients presented behavioral problems, the only reasonable explanation for pushing and striking them with a bat would be to inflict unjustifiable pain or suffering. Consequently, viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could have found all the essential elements of the crime on each count of cruelty to the infirm.
This assignment of error is without merit.

ERROR PATENT REVIEW
We have reviewed the record for errors patent in accordance with guidelines in State v. Oliveaux, 312 So.2d 337 (La. 1975) and State v. Schneider, 542 So.2d 620 (La.App. 5 Cir.1989), and have discovered the following.
The transcript of the sentencing reveals that the court sentenced the defendant to one year each on counts 1, 2, 3 and 4 to be served consecutively; further, the court fined the defendant $10,000.00 plus costs on count one. The minutes and commitment indicate that the sentence included the additional sentence of one year in prison if defendant fails to pay the fine and costs. When there is a discrepancy between the minutes and the transcript, the transcript prevails. State v. Lynch, 441 So.2d 732 (La.1983). Because, in the transcript, the court did not impose the additional year in default of payment, the sentence was illegally imposed. Further, defendant was sentenced on count 4, on which he was found not guilty, and not sentenced on count 5 on which he was found guilty. Consequently, the case should be remanded for resentencing.

DECREE
For the foregoing reasons, the conviction is affirmed. That portion of the sentence which required the defendant to spend one additional year in prison in default of paying the fine and that portion of the sentence which imposes punishment for count 4 is vacated and set aside. The remainder of the sentence is affirmed and the case is remanded for resentencing in order to make corrections in the sentence as noted above.
AFFIRMED; REMANDED FOR RESENTENCING.
NOTES
[1] Janice Benn-King and Louis Wicker, Jr. were also charged along with the defendant. The state dismissed counts 2, 4, 5 and 6 as to Janice Benn-King in exchange for her guilty plea. The record does not reveal the outcome of the charges against Wicker.
[2] These cases discuss LSA-R.S. 14:93(A), which is worded very similarly to 14:93.3:

A. Cruelty to juveniles is the intentional or criminally negligent mistreatment or neglect, by anyone over the age of seventeen, of any child under the age of seventeen whereby unjustifiable pain or suffering is caused to said child. Lack of knowledge of the child's age shall not be a defense.
[3] LSA-R.S. 14:18 reads as follows:

Sec. 18 Justification; general provisions
The fact that an offender's conduct is justifiable, although otherwise criminal, shall constitute a defense to prosecution for any crime based on that conduct. This defense of justification can be claimed under the following circumstances:
(1) When the offender's conduct is an apparently authorized and reasonable fulfillment of any duties of public office; or
(2) When the offender's conduct is a reasonable accomplishment of an arrest which is lawful under the Code of Criminal Procedure; or
(3) When for any reason the offender's conduct is authorized by law; or
(4) When the offender's conduct is reasonable discipline of minors by their parents, tutors or teachers; or
(5) When the crime consists of a failure to perform an affirmative duty and the failure to perform is caused by physical impossibility; or
(6) When any crime, except murder, is committed through the compulsion of threats by another of death or great bodily harm, and the offender reasonably believes the person making the threats is present and would immediately carry out the threats if the crime were not committed; or
(7) When the offender's conduct is in defense of persons or of property under any of the circumstances described in Articles 19 through 22.