SUSAN M. CHEHARDY, Judge.
 

 |20n January 8, 2009, the Jefferson Parish Grand Jury indicted defendant, Lon Adams, on one count of second degree murder, in violation of La. R.S. 14:30.1, for the homicide of his father, Leroy Adams, Sr. Trial before a twelve-person jury commenced on September 21, 2009. After five days of testimony and evidence, the unanimous jury found defendant guilty of the responsive verdict of manslaughter, a violation of La. R.S. 14:31. On December 11, 2009, the trial judge sentenced defendant to imprisonment at hard labor for 20 years.
 

 Facts
 

 In 2005, like many homes in the Greater New Orleans area, Leroy Adams, Sr.’s house in New Orleans East was destroyed in the aftermath of Hurricane Katrina. When Mr. Adams, who was 79 years old at that time, returned from evacuating the area, he moved in with his son, Lon, and his grandson, Chad, to Lon’s house in Me-tairie. Although Mr. Adams evacuated with both of his children and their families, he did not move in with his daughter, Lynn Landreneau, and her family when they returned because the Landreneaus were housing two other elderly relatives, who had been left homeless after the storm.
 

 | sIn the Fall of 2005, as was their custom, Mr. Adams, Lon, and Chad joined the Landreneaus for family celebrations several times. On December 25, 2005, Lon brought Mr. Adams and Chad to the Lan-dreneau’s house to celebrate the holiday. Mrs. Landreneau recounted that, when her father first arrived with Lon, her father did not seem to recognize her but, after lunch, he seemed more like himself. Several family members also recounted that Mr. Adams had lost a lot of weight in only a few months. That day was the last time that Mrs. Landreneau saw her father alive.
 

 Mrs. Landreneau stated that, over the next several months, she called Lon’s house many times trying to speak to her father, but she usually got the answering machine. Mrs. Landreneau reported that, if Lon did answer the phone, he would not let her speak to their father. She remembered Lon telling her either that their father was sleeping and did not want to be awakened, or that their father was angry with Lynn and did not want to speak with her.
 

 On July 26, 2006, Mrs. Landreneau contacted the Jefferson Parish Sheriffs Office (“JPSO”) regarding her brother’s refusal to allow her to communicate with their father. Mrs. Landreneau stated that the deputy informed her that, without further indication of criminal activity, the Sheriffs Office would not investigate a family squabble. She was warned that she could not enter Lon’s house without his permission.
 

 That day, Mrs. Landreneau and her husband went to Lon’s house anyway, but Lon refused to let them inside. She remembered smelling a “horrible” odor, which was not a “Katrina” smell, from inside of Lon’s house when he opened the door. However, immediately after opening the
 
 *226
 
 door, Lon exited the house, slamming the front door to her and her husband.
 

 |4Lon went straight to his vehicle but, before he left, Lon told Lynn Landreneau that he had put their father into a nearby nursing home in Metairie. That day, when the Landreneaus went to that particular nursing home to confirm Mr. Adams presence, the staff found no record that Mr. Adams had been placed into their care.
 

 In November of 2006, Lynn called Lon to invite him, her father, and nephew to celebrate Thanksgiving with her family. Lon accepted for himself and his son but explained that their father would only come to dinner on the condition that Lynn agreed not to talk to him because he was still not speaking to her. Lynn refused to agree, which, she remembered made Lon seem relieved. That year, Lon and Chad came to Thanksgiving dinner without Mr. Adams.
 

 Over the next eighteen months, Lon and Chad went to the Landreneau’s house for family functions without Mr. Adams, claiming that Mr. Adams refused to attend because he was still not speaking to Lynn. During that same time frame, Lynn Lan-dreneau filed a complaint with Elderly Protective Services, a service of the Louisiana Governor’s Office of Elderly Affairs. Further, during that time frame, Mrs. Landreneau noticed that there were monthly deposits from Social Security and other sources into Mr. Adams bank account,
 
 [1]
 
 but only one withdrawal — a check to Lon Adams.
 

 On the afternoon of June 2, 2008, Mrs. Landreneau went to the Jefferson Parish Sheriffs Office in Metairie to again try to report her father as missing. Within the hour, Jefferson Parish Sheriffs Officer Joseph Ventola went to Lon’s residence. Lon refused to admit Officer Ventola into his house stating that his father was sleeping and the house was messy. Officer Ventola told Lon that the investigation into his father’s alleged disappearance was “not going away.”
 

 |sThe next morning, Sergeant Lisa Lunsford contacted local hospitals, nursing homes, and correctional facilities in an attempt to ascertain Mr. Adams’ whereabouts. When her search was unsuccessful, Sergeant Lunsford notified her supervisor, Captain Hilda Montecino, that JPSO needed to determine whether Mr. Adams was in the residence.
 

 Sergeant Lunsford and Captain Montec-ino went to the residence and knocked on the door, but there was no response. The officers decided to maintain surveillance on the house.
 

 A little while later, the officers observed a vehicle matching the description of Lon’s vehicle turn onto Lon’s street. After turning onto the street, however, the driver drove past Lon’s house without stopping. Deputy David Randall and Detective Todd Giacona immediately conducted a traffic stop and removed Lon and Chad from the vehicle. Officer Randall advised Lon of his rights and asked for consent to search his residence. As Captain Montecino was filling out the consent to search form, she got a call from another officer informing her that a judge had signed a warrant allowing JPSO to search the house.
 

 Immediately, Detective Giacona entered the house. Deputy Randall stood outside for officer safety with Captain Montecino and Lon, while Detective Giacona went inside. When Detective Giacona went to the second floor of the house, he observed
 
 *227
 
 three rooms at the top of the stairwell — a bedroom to the left, a bathroom in front, and another bedroom to the right, later identified as Chad’s bedroom. To Detective Giacona, it appeared that the entire second floor area had suffered water incursion as a result of roof damage. Although the entire second floor smelled like mildew, a “really disgusting smell” came from the left bedroom.
 

 | ^Detective Giacona, using his shoulder, forced the door to the left bedroom open about a foot and found debris behind it.
 
 [2]
 
 It was dark inside and the windows were closed. Using his flashlight, he was able to see skeletal remains on top of the bed. The remains were later identified as those of Leroy Adams, Sr.
 

 As Detective Giacona descended the stairs from the second floor, Lon asked about his father. When Detective Giacona told him that his father was dead, Lon did not react emotionally to the news.
 

 JPSO deputies then transported Lon to the investigations bureau where he was again advised of his constitutional rights. Lon waived his rights then gave a statement to Lieutenant Donald Meunier. In that statement, which was played for the jury at trial, Lon said that the last time he entered his father’s bedroom was in 2006, and that he did not know when his father had died. Lon claimed neither he nor anyone else ever physically abused or harmed his father. He could not explain why he did not go into the room after that time, and he believed that the examination of the remains would show that his father died of old age.
 

 After giving the statement, Detectives Roger Gorumba and Keith Locascio transported Lon to West Jefferson Medical Center so he could undergo a psychological evaluation. Lon stayed there for nine days — from June 3 to June 12, 2008. During that nine-day period, Lieutenant Meu-nier received preliminary findings regarding the skeletal remains, which showed that the victim sustained substantial bone damage, including 24 rib fractures, multiple fractures of the hyoid bone,
 
 [3]
 
 a fractured toe, and a fractured finger.
 

 |7On June 12, 2008, Lieutenant Meunier learned from the Jefferson Parish Coroner’s office that Lon was going to be released from the hospital at approximately 1:00 p.m. After obtaining that information, he and Detective Locascio went to West Jefferson Medical Center. When they saw defendant leaving, Lieutenant Meunier approached him to ask if he would come to the JPSO Detective Bureau for additional questions. Lieutenant Meu-nier testified that Lon willingly agreed. Lieutenant Meunier and Detective Locas-cio transported Lon to the detective bureau where they again advised Lon of his rights. Lon gave four more statements that day.
 

 In his first statement on June 12, 2008 at 1:28 p.m., Lieutenant Meunier told Lon that the preliminary medical findings suggested that his father died as a result of trauma. When asked about his father’s injuries, Lon recalled that, in late 2005 or early 2006, his father fell out of bed onto an army footlocker and injured his ear.
 
 *228
 
 Lon also recalled that his father fell down the stairs twice, but was not injured. Lon denied hurting his father and maintained that any trauma would have been from one of the falls that his father had taken. Finally, he indicated that he might have been concerned about reporting his father’s death because he felt as if he did not adequately care for his father.
 

 In his second statement on June 12, 2008 at 2:14 p.m., Lieutenant Meunier asked Lon if he had told his son, Chad, not to say certain things to the police that might get Lon into trouble. Lon explained that he was concerned that Chad, who is developmentally disabled, might report that Lon and his father argued.
 

 Lon thought his father was alive in the first quarter of 2006, but not after that. Lon agreed that he might not have cared for his father as well as he should have. Lon admitted that it was possible that his father died from starvation. He |8claimed that he concealed his father’s death because he was embarrassed and ashamed that he had allowed his father to die “on his watch.”
 

 In his third statement on June 12, 2008 at 4:55 p.m., Lieutenant Meunier asked Lon for more specific information about his father’s injuries. Lon said that, when his father urinated on the bathroom flooi’, the floor became slippery, which caused his father to fall. After a fall, Lon would have to help his father up from the floor. Lon explained that he would lift his father up with one hand underneath his father’s ann and one underneath his neck. Lon asserted that his father’s neck could have been injured when Lon picked him up.
 

 Lon also stated that his father frequently fell out of bed. Lon said that the last time he helped his father back into bed was during the first quarter of 2006. He stated that the last time he put his father into bed, his father was conscious. Lon denied hitting his father but admitted that he may have pushed his father down onto the bed. He said that his father could have been injured by falling out of his bed onto a footlocker, which was about 18 inches from the side of the bed. He also conceded that he probably did not sufficiently attend to his father’s nutrition or supervision.
 

 In his fourth and last statement of June 3, 2008, which was given at 8:52 p.m., Lon remembered the event that could have caused his father’s injuries. He recounted that, one night in the second quarter of 2006, he heard a thump and thought his father probably had fallen out of bed. Lon went into the bedroom to pick up his father, who was very difficult to lift. He picked his father up by putting both hands underneath him and “almost throwing” him into bed. Lon lost his balance and fell on top of his father. He thinks his right forearm landed across his father’s throat. Mr. Adams cried out in a small gasp of pain; however, his father was still conscious. Lon said the pain would have been pretty severe, but his father |9did not say anything. His father curled up like he always did, and Lon either covered his father or his father covered himself.
 

 After that incident, Leroy Adams never exited the room, and Lon never went back in again. Before that incident, his father used
 
 to come
 
 downstairs
 
 to
 
 eat, but after that incident, he did not. Lon knew after a while that his father was dead, but it was difficult for him to admit it, especially since he had accidentally hurt his father “that bad.”
 

 After Lon gave his statements, Lieutenant Meunier drove him back to his house. The officers did not arrest Lon at that point because his father’s death had not yet been ruled a homicide. Specifically, the medical examiner had not yet rendered
 
 *229
 
 her report declaring the manner and cause of the victim’s death.
 

 Mary Manhein, an expert forensic anthropologist, testified that she and her assistants recovered the skeletal remains from the defendant’s house. Dr. Manhein opined that the victim died between six months to three years before the remains were discovered. Dr. Manhein noted that the remains revealed, among other things, evidence of perimortem trauma, which is trauma that happened at or around the time of death.
 

 Dr. Manhein testified that the victim sustained multiple perimortem bone fractures: two of the hyoid bone; two of the ossified thyroid cartilage; two fingers of the left hand; thirteen on the left ribs, eleven on the right ribs; one of the eleventh thoracic vertebrae and one of the right big toe. Dr. Manhein opined that the perimortem trauma was likely caused by a direct blunt force trauma inflicted in one or more events. She said that, in order for the hyoid to break, it would have been subjected to squeezing or pressure from side-to-side. She also said that the thyroid cartilage could have been broken by blunt force, which could have occurred if the area was hit from the front.
 

 |inDr. Manhein asserted that considerable force was required to inflict such a wide scale pattern of damage to the back and front of the body. Dr. Manhein testified that she had only seen this type of widespread trauma one other time, in a person who was most likely run over by a car. Dr. Manhein testified that the damage shown in the skeletal remains was not sustained as the result of the victim falling from the bed onto the footlocker because the height was not great enough.
 

 Dr. Karen Ross, an expert forensic pathologist employed as Assistant Coroner for the Jefferson Parish Coroner’s Office, also examined the remains to determine manner and cause of death. She testified that the manner of death was homicide and the cause of death “most likely was intentionally inflicted blunt force injuries.” Dr. Ross relied heavily upon the anthropo-logic exam in forming her opinion.
 

 Dr. Ross explained that the injury to the victim’s hyoid bone was more consistent with pressure being applied by a hand or a finger, rather than a fall. Further, the victim’s neck injuries could also have been caused by blunt force trauma, i.e., a direct blow to the neck. She stated that the types of injuries sustained by the victim were the result of high-impact force seen in motor vehicle or industrial accidents.
 

 Dr. Ross testified that, given the extent of bone damage present in this victim, he would have likely experienced bruising and/or hemorrhage in the lungs; “likely tears of the pleura with pneumothorax;” blood and air collecting in the chest; and bleeding from the arteries, which would have been fatal. Dr. Ross stated that, in her opinion, the victim’s death would have been painful and not instantaneous. Dr. Ross testified that, if the victim had been brought to the hospital after sustaining the injuries, it is possible that he would have survived.
 

 _J_yDr. Ross testified that it was' not possible, in her opinion, that the victim sustained the distinct injuries by falling out of bed onto a footlocker. Dr. Ross disagreed that all 29 rib fractures occurred at the same time because only 24 of the fractures were perimortem, i.e., at or near the time of death.
 

 Additionally, Dr. Ross noted that the victim’s skeleton did not exhibit signs of significant osteoporosis. Further, the most common injuries to osteoporosis sufferers were head injuries and hip fractures, which the victim did not have.
 

 
 *230
 
 Chad Adaras, defendant’s son, testified, in late 2005 or early 2006, he saw his grandfather fall down the stairs once. He also testified that, around that same time, defendant told him that his grandfather fell again and was injured. After the second fall, defendant told Chad that his grandfather was in the hospital. Chad testified that, whenever he asked defendant where his grandfather was, defendant told him that his grandfather was sick in the hospital.
 

 Chad could not remember the last time that he saw his grandfather alive. Chad stated that he did not know his grandfather was hurt in the bedroom and did not know his grandfather was dead before the skeletal remains were found. Chad remembered smelling a weird smell in the house, but he thought it was dead rats or mice.
 

 Chad remembered telling his cousin on Christmas Day in 2005 that their grandfather sometimes beat on the walls of his bedroom with a cane and screamed for food and water, which was “driving him crazy.” Chad testified that, when his grandfather did that, he and defendant would bring his grandfather food and water. He stated that neither he nor defendant ever hit his grandfather.
 

 Salvadore Brocato, defendant’s next door neighbor, testified that in mid to late 2006, he and his wife noticed flies in the top left window on the second floor of defendant’s home. He thought that the flies were attracted to a dead animal in 112the second floor area because the roof was damaged and that area of the house was exposed. He never saw anyone, other than Chad and defendant, going into the house.
 

 The defense presented testimony from Dr. Charles Cefalu, an expert in the fields of geriatrics, elder abuse, and osteoporosis, who reviewed the reports of Drs. Ross and Manhein, defendant’s statements, and the victim’s Methodist Hospital medical records. Dr. Cefalu stated that Mr. Adams was an 80-year-old man who was relatively immobile, diabetic, suffering with chronic lung disease, increased risk of osteoporosis, and Alzheimer’s disease. In his opinion, if the victim had rolled off of his bed and hit the edge of a wooden box, i.e. the footlocker, he could have suffered the injuries present at the time of death. Dr. Cefalu opined that the victim’s injuries were probably caused in this way.
 

 Dr. Cefalu testified that Mr. Adams’ injuries were consistent with a one-impact injury because the injury was linear. He did not think defendant stumbling and falling onto his father was the cause of death. Based on Mr. Adams’ neck injuries, Dr. Cefalu thought there was a pretty significant chance that Mr. Adams had suffered an acute airway obstruction, which could lead to death within minutes if not resolved. He testified that it would take minimal trauma in an individual with severe osteoporosis, like Mr. Adams, to cause the injuries seen in the skeletal remains.
 

 On cross-examination, Dr. Cefalu admitted that his opinion that Mr. Adams suffered with Alzheimer’s disease was based on testimony that Mr. Adams failed to recognize his daughter on Christmas Day of 2005. Dr. Cefalu also stated that his opinion that Mr. Adams experienced chronic lung disease and osteoporosis was based on risk factors, not medical records. He did not remember seeing the question marks after the word “diabetes” in the victim’s medical records.
 

 | isThe defense also presented testimony from Dr. Jaime Garza, an expert in the fields of head and neck trauma, airway management, and reconstructive surgery, whose opinion was developed from review
 
 *231
 
 ing the reports of Drs. Ross and Manhein. Dr. Garza testified that falling out of bed and landing on the corner of the footlocker could have caused the injury to Mr. Adams’ hyoid bone and cartilage, and if that occurred, it was very likely Mr. Adams’ airway would have been compromised. He said the victim would have thrashed for about 90 seconds trying to get oxygen then suffered brain death after about eight minutes. Dr. Garza disagreed with the police and the medical experts who said there was no other reasonable scenario to explain Mr. Adams’ injuries other than homicide.
 

 Dr. Garza said the gasp that the defendant heard after he fell on his father made sense because often a person on the verge of dying releases such a sound. He did not think calling 911 would have saved Mr. Adams’ life, because it would have been too late. He expected that an 80-year-old man with Alzheimer’s and who smoked, as Mr. Adams did, to have osteoporosis.
 

 Defendant testified, on his own behalf, that his father’s health deteriorated rapidly after Hurricane Katrina. In fact, defendant retired in November of 2005 to eliminate “job stress” and to care for his father. Defendant maintained that his father fell down the stairs twice, but was not injured and did not want to go to the doctor. Defendant stated that his father fell in his bedroom two or three times a week.
 

 Generally, he would find his father on the floor on the side of the bed, either the left or the right side. Defendant knew his father had fallen before on the footlocker when he fell out of bed. He last saw his father alive in the spring of 2006. Defendant was asleep on the sofa downstairs when he heard a loud noise he had heard several times before, and he assumed his father had fallen out of the bed. 114Pefendant went upstairs and found his father on the floor on the side of the bed. He lifted his father to put him on the bed.
 

 Defendant guessed he hit the side of the bed which caused him to drop his father on the bed and then fall across his father with his forearms. He heard a gasp or small cry and could tell his father was in pain. Defendant testified that it then became apparent to him that his father was not breathing, and he realized his father had passed away. He thought he might have accidentally hurt his father and caused his death. He did not call 911 because he could not admit it to himself or anyone else that he might have accidentally killed his father.
 

 After hearing the testimony and evidence, the twelve-person jury found defendant guilty of the responsive verdict of manslaughter. On appeal, defendant raises six assignments of error:
 

 • first, the court erred in denying the March 27, 2009 Motion to Suppress filed by defendant herein in that the statements sought to be suppressed therein were obtained in violation of the Fourth Amendment of the United States Constitution;
 

 • second, the court erred in allowing the statements of defendant obtained in violation of the Fourth Amendment to be entered into evidence at the trial of this matter, which allowance prejudiced defendant at the trial of this matter;
 

 • third, the jury erred in finding that the State proved every element of the crime of manslaughter beyond a reasonable doubt in that, when viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could not have found the essential elements of the offense of manslaughter proved beyond a reasonable doubt;
 

 
 *232
 
 • fourth, the court erred in denying defendant’s Motion for New Trial;
 

 • fifth, the court erred in denying defendant’s Motion for Post Verdict Judgment of Acquittal; and
 

 • sixth, the court erred in sentencing defendant Lon Adams to twenty (20) years imprisonment.
 

 |
 
 ]rJuaw and Argument
 

 In his third
 
 [4]
 
 assignment of error, the defendant argues that the jury erred in finding that the State proved every element of the crime of manslaughter beyond a reasonable doubt in that, when viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could not have found the essential elements of the offense of manslaughter proved beyond a reasonable doubt. He contends that Dr. Karen Ross, the State’s main witness, testified that the injuries were
 
 most likely
 
 intentionally inflicted by blunt force trauma, a standard he asserts was insufficient to meet the State’s burden of proof. Defendant further contends that the only evidence of guilt were his statements, which were obtained in violation of the Fourth Amendment and should have been suppressed.
 

 In reviewing the sufficiency of evidence, an appellate court must determine that the evidence, whether direct or circumstantial, or a mixture of both, viewed in the light most favorable to the prosecution, was sufficient to convince a rational trier of fact that all of the elements of the crime have been proven beyond a reasonable doubt.
 
 Jackson v. Virginia,
 
 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979);
 
 State v. Neal,
 
 00-0674, p. 9 (La.6/29/01), 796 So.2d 649, 657,
 
 cert. denied,
 
 535 U.S. 940, 122 S.Ct. 1323, 152 L.Ed.2d 231 (2002).
 

 In cases involving circumstantial evidence, the trial court must instruct the jury that, “assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence.” La. R.S. 15:438. The reviewing court is not required to determine whether another possible hypothesis of innocence suggested by the defendant offers an exculpatory | ^explanation of events. Rather, the reviewing court must determine whether the possible alternative hypothesis is sufficiently reasonable that a rational juror could not have found proof of guilt beyond a reasonable doubt.
 
 State v. Mitchell,
 
 99-3342, p. 7 (La.10/17/00), 772 So.2d 78, 83;
 
 State v. Washington,
 
 03-1135, p. 4 (La.App. 5 Cir. 1/27/04), 866 So.2d 973, 977.
 

 In the instant case, defendant was charged with second degree murder, but convicted of the lesser included offense of manslaughter. Under La. R.S. 14:31(A)(2)(a), manslaughter is a homicide committed, without any intent to cause death or great bodily harm, when the offender is engaged in the perpetration or attempted perpetration of any felony not enumerated in the definitions of first and second degree murder, or of any intentional misdemeanor directly affecting the person. In this case, the jury was instructed
 
 *233
 
 that, in order to find defendant guilty under this theory, it had to find that defendant killed the victim and defendant was engaged in the perpetration or attempted perpetration of cruelty to the infirmed or simple battery.
 

 Cruelty to the infirmed is the intentional or criminally negligent mistreatment or neglect by any person, including a caregiver, whereby unjustifiable pain, malnourishment, or suffering is caused to the infirmed, a disabled adult, or an aged personf.] La. R.S. 14:93.3(A). The term “intentional” as used in this statute refers to a general criminal intent to mistreat or neglect and does not require an intent to cause unjustifiable pain and suffering.
 
 State v. Scott,
 
 582 So.2d 864, 867 (La.App. 5 Cir.1991),
 
 writ denied,
 
 584 So.2d 1171 (La.1991).
 

 “Unjustifiable,” within the meaning of La. R.S. 14:93.3, is a term of limitation intended to distinguish that pain and suffering, which is an inevitable consequence of care and treatment from that which is not justified by medical needs.
 
 State v. Brenner,
 
 486 So.2d 101, 104 (La.1986). “Mistreatment” is in common us age and is equated with “abuse.”
 
 State v. Comeaux,
 
 319 So.2d 897, 899 (La.1975).
 

 “Caregiver” is defined as any person ... who temporarily or permanently is responsible for the care of the infirmed, physically or mentally disabled adult, or aged person, whether such care is voluntarily assumed or is assigned. Caregiver includes, but is not limited to, adult children. La. R.S. 14:93.3(B). For the purposes of this Section, an aged person is any individual sixty years of age or older. La. R.S. 14:93.3(C).
 

 Criminal negligence exists when, although neither specific nor general criminal intent is present, there is such disregard of the interest of others that the offender’s conduct amounts to a gross deviation below the standard of care expected to be maintained by a reasonably careful man under like circumstances. La. R.S. 14:12. The determination of whether the requisite intent is present in a criminal case is for the trier of fact.
 
 State v. Huizar,
 
 414 So.2d 741, 751 (La.1982).
 

 Any person who, having a specific intent to commit a crime, does or omits an act for the purpose of and tending directly toward the accomplishing of his object is guilty of an attempt to commit the offense intended; and it shall be immaterial whether, under the circumstances, he would have actually accomplished his purpose. La. R.S. 14:27. The credibility of witnesses is within the sound discretion of the trier of fact, who may accept or reject, in whole or in part, the testimony of any witness; the credibility of the witnesses will not be reweighed on appeal.
 
 State v. Rowan,
 
 97-21, p. 7 (La.App. 5 Cir. 4/29/97), 694 So.2d 1052, 1056.
 

 11sIn the instant case, we find that there was ample evidence presented to support defendant’s manslaughter conviction. The testimony established that, in 2005, Mr. Adams was 79 years old and, therefore, an “aged person” pursuant to La. R.S. 14:93.3(C). The testimony also established that defendant qualified as a “caregiver,” as defined in La. R.S. 14:93.3(B).
 

 Here, defendant stated that he “swung” his father onto the bed, stumbled, and fell on top of his father. Defendant stated that, when he fell, he landed with his forearm pressing on top of his father’s neck. Defendant knew that his father was injured because his father let out a heavy sigh. Defendant did not seek medical treatment for his father.
 

 Although at trial defendant claimed that calling “911” was useless at that point
 
 *234
 
 because his father was dead, he told detectives immediately after his father’s remains were discovered that his father was alive the last time defendant left his room. Dr. Ross testified that Mr. Adams’ death would have been painful and not instantaneous but that he might have survived if he had been brought to a hospital after he was injured.
 

 Moreover, even if his father was only slightly injured in that accident, defendant knew that his father was not mobile but did not check on him for over two years. Further, defendant admitted that he thought that his father died of starvation because he did not provide his father with either food or water for more than two years.
 

 In light of the foregoing, we find that the State presented sufficient evidence for a reasonable trier of fact to find that Lon Adams committed manslaughter under La. R.S. 14:31(A)(2)(a), in that Lon killed his father without any intent to kill or to inflict great bodily harm while Lon was engaged in the perpetration or attempted perpetration of cruelty to the infirmed.
 
 Cf. State v. Booker,
 
 42,596 (La.App. 2 Cir. 10/31/07), 968 So.2d 1190,
 
 writ denied,
 
 07-2295 (La.4/25/08), 978 So.2d 364, (evidence was sufficient to support defendant’s conviction for cruelty to the infirm, where defendant grossly neglected even the most basic duty of care, which caused needless suffering to the victim and placed her in great danger, and abandoned victim in deplorable conditions.) We find that this argument lacks merit.
 

 Returning to defendant’s first two assignments of error, he argues that the court erred in denying his motion to suppress statements obtained in violation of the Fourth Amendment of the United States Constitution and in allowing those statements to be introduced into evidence at trial. Specifically, defendant argues that he was arrested without probable cause when the officers handcuffed him after the skeletal remains were found on June 3, 2008. He contends that, since the officers had no probable cause to arrest him that day, his arrest was illegal, and his statement obtained as a direct result of that arrest should have been suppressed. He further asserts that the JPSO did not have probable cause to arrest him on June 12, 2008 and, as such, his inculpatory statements were inadmissible.
 

 At the outset, we note that this issue is not properly before this Court. We have carefully reviewed defendant’s motion to suppress inculpatory statements. Although defendant alleged that “his arrest was not supported by probable cause and, therefore, his statements must be suppressed as the fruits of an illegal arrest,” defendant did not provide any facts or evidence to support that argument. Furthermore, at the suppression hearing, defense counsel did not argue that defendant’s statements were inadmissible because they were obtained after an illegal arrest.
 
 [5]
 
 The Fourth Amendment issue was not argued in the trial court and, | aithus, not ruled on by the trial judge. We find that this issue is not properly before this Court on appeal and, thus, we are precluded from addressing it. U.R.C.A. 1-3.
 

 In the next two assignments of error, defendant argues that the trial judge erred by denying his post-trial motions for new trial and post-verdict judgment of acquittal. After trial, defendant moved for a new trial on the basis that the verdict is
 
 *235
 
 contrary to the law and evidence presented. At the hearing on the motions, defense counsel argued that a new trial should be granted because the verdict was based on inadmissible evidence, including statements that defendant made to the officers after an illegal arrest, which prejudiced the defendant.
 

 La.C.Cr.P. art. 851(1) provides that, on motion of the defendant, the court shall grant a new trial whenever the verdict is contrary to the law and the evidence. However, the denial of a motion for new trial based on the verdict being contrary to the law and evidence fails to present an issue reviewable on appeal.
 
 State v. Condley,
 
 04-1349, p. 11 (La.App. 5 Cir. 5/31/05), 904 So.2d 881, 888,
 
 writ de
 
 nied; 05-1760 (La.2/10/06), 924 So.2d 163. Hence, there is no issue for review by this Court.
 

 After trial, defendant also moved for post-verdict judgment of acquittal on the basis that the State failed to meet its burden of proof of homicide. The question of sufficiency of the evidence is properly raised by a motion for post-verdict judgment of acquittal. La.C.Cr.P. art. 821;
 
 State v. Hampton,
 
 98-331, p. 12 (La.4/23/99), 750 So.2d 867, 880,
 
 cert. denied,
 
 528 U.S. 1007, 120 S.Ct. 504, 145 L.Ed.2d 390 (1999). Here, we have reviewed the sufficiency of the evidence in an earlier assignment of error and found that the State presented sufficient evidence to support the jury’s verdict. As such, we find no error in the trial court’s denial of defendant’s motion for post-verdict judgment of acquittal.
 

 12i In his final assignment of error, the defendant argues that the court erred in sentencing him to twenty (20) years imprisonment. Defendant argues that his 20-year sentence is constitutionally excessive. He contends that the trial judge erred by basing the sentence on the fact that he heard nothing about mitigation or the reasons why defendant treated his father so badly. Defendant asserts that he had nothing to mitigate because he did not kill his father.
 

 At sentencing, the trial judge spoke at length about the case. The trial judge, who had been a seasoned prosecutor, stated that this case was the most difficult of his career and weighed heavily on his mind.
 

 The trial judge stated that he wanted to hear some mitigation, some explanation as to what would cause defendant to treat his father like that. He remarked that dealing with Alzheimer’s patients was not an easy job but could not think of an excuse for defendant’s treatment and neglect of his father nor imagine what defendant’s father in his confused state must have experienced.
 

 The trial judge stated that he did not believe the testimony of the defense’s expert witnesses, who testified that Mr. Adams rolled out of bed, hit a footlocker, and fractured 29 ribs, crushed the hyoid bone, and fractured a toe. He said he was convinced by the testimony of the State’s experts, Dr. Ross and Dr. Manhein.
 
 [6]
 

 The trial judge stated he had read all the letters submitted by the State and the defense and the pre-sentence investigation.
 
 [7]
 
 The trial judge commented:
 

 
 *236
 
 I can’t imagine somebody would allow his own father to lie in a bed to decompose without the human decency to at least make some sort of attempt to save his life or do something.
 

 | ¡.¡.The trial judge then said he had taken into consideration La. C.Cr.P. art. 894.1. The trial judge noted that defendant maintained his position that he did not commit a crime. The trial judge sentenced defendant to serve 20 years at hard labor.
 

 The Eighth Amendment to the United States Constitution and Article I, § 20 of the Louisiana Constitution prohibit the imposition of excessive punishment. Although a sentence is within statutory limits, it can be reviewed for constitutional excessiveness.
 
 State v. Smith,
 
 01-2574, p. 6 (La.1/14/03), 839 So.2d 1, 4. A sentence is considered excessive if it is grossly disproportionate to the offense or imposes needless and purposeless pain and suffering.
 
 Id.
 
 A sentence is grossly disproportionate if, when the crime and punishment are considered in light of the harm done to society, it shocks the sense of justice.
 
 State v. Lawson,
 
 04-334, p. 6 (La.App. 5 Cir. 9/28/04), 885 So.2d 618, 622.
 

 A trial judge has broad discretion when imposing a sentence and a reviewing court may not set a sentence aside absent a manifest abuse of discretion. The issue on appeal is whether the trial court abused its discretion, not whether another sentence might have been more appropriate.
 
 State v. Dorsey,
 
 07-67, p. 5 (La.App. 5 Cir. 5/29/07), 960 So.2d 1127, 1130. The appellate court shall not set aside a sentence for excessiveness if the record supports the sentence imposed.
 
 State v. Pearson,
 
 07-332, p. 15 (La.App. 5 Cir. 12/27/07), 975 So.2d 646, 656. In re viewing a trial court’s sentencing discretion, three factors are considered: 1) the nature of the crime; 2) the nature and background of the offender; and 3) the sentence imposed for similar crimes by the same court and other courts.
 
 Id.,
 
 07-332 at 15-16, 975 So.2d at 656.
 

 In the instant case, defendant was convicted of manslaughter. Whoever commits manslaughter shall be imprisoned at hard labor for not more than 40 years. La. R.S. 14:31(B). Defendant received a 20-year sentence.
 

 In
 
 State v. Anseman,
 
 607 So.2d 665 (La.App. 5 Cir.1992),
 
 writs denied,
 
 613 So.2d 989 (La.1993) and 613 So.2d 990 (La.1993), a mother and father were convicted of manslaughter based on the predicate felony of cruelty to juveniles stemming from the death of their 13-month-old daughter, who died from wasting and nutritional deprivation. The defendants’ flea-infested apartment had dog hair throughout, feces smeared on the walls, smelled of urine, and had trash and dirty dishes accumulated in the kitchen. They were each sentenced to 21 years at hard labor, the maximum sentence at that time.
 

 This Court found that the sentences were not constitutionally excessive, noting the 13-month-old helpless child died at the hands of her own parents; the defendants had every opportunity to prevent this senseless death; and friends and government agencies offered needed assistance to the defendants who chose to ignore those offers of assistance, despite the ever worsening physical condition of their daughter prior to her death. This Court further found that the action and inaction of the defendants, as parents of this young victim, were inexcusable, and that the offense
 
 *237
 
 was particularly cruel and heinous and, therefore, warranted imposition of the maximum sentence.
 
 [8]
 

 Id.,
 
 607 So.2d at 675.
 

 In the instant ease, defendant knew that his father was injured, yet he did not call 911 or seek medical treatment for him. He left his father to die alone in his room. Defendant never went back into his father’s room again to check on him or bring him food or water; instead defendant lived in the house while his father’s body was decomposing.
 

 Dr. Ross testified that Mr. Adams’ death would not have been instantaneous based on what she had seen, and Mr. Adams’ death would have been painful. SheJ^also testified that if Mr. Adams had been brought to the hospital, it is possible he would have survived.
 

 Furthermore, defendant lied in an effort to hide his father’s death and body from his family, governmental agencies, and then the police. Considering the nature of the crime, the nature and the background of the offender, and the sentences imposed for similar crimes, we do not find that the 20-year sentence was constitutionally excessive. This assignment lacks merit.
 

 Finally, we have reviewed the record for errors patent, according to La. C.Cr.P. art. 920. We note that the trial judge failed to adequately advise defendant of the two-year prescriptive period for seeking post-conviction relief as mandated by La.C.Cr.P. art. 930.8. Therefore, we advise defendant, by this opinion, that no application for post-conviction relief, including an application which seeks an out-of-time appeal, shall be considered if it is filed more than two years after the judgment of conviction and sentence has become final under the provisions of La. C.Cr.P. arts. 914 and 922.
 
 State v. Smith,
 
 08-579, p. 10 (La.App. 5 Cir. 2/25/09), 9 So.3d 238, 244. In all other respects, the defendant’s conviction and sentence are affirmed.
 

 AFFIRMED
 

 [1]
 

 . After the storm, Mr. Adams mail, including his bank statements was forwarded to Mrs. Landreneau.
 

 [2]
 

 . Detective Roger Gorumba testified that there were holes in the roof, including one in Mr. Adams' bedroom and one in Chad's bedroom. Detective Locascio testified that the ceiling had collapsed upstairs. Further, a neighbor also testified that there were a number of holes in the roof after Hurricane Katrina.
 

 [3]
 

 . The hyoid bone, also known as the "lingual bone,” is a horseshoe-shaped bone situated in the anterior midline of the neck between the chin and the thyroid cartilage. At rest, it lies at the level of the base of the mandible in the front and the third cervical vertebra behind.
 

 [4]
 

 . When the issues on appeal relate to both the sufficiency of evidence and one or more trial errors, the reviewing court should first determine the sufficiency of the evidence by considering the entirety of the evidence.
 
 State v. Hearold,
 
 603 So.2d 731, 734 (La.1992). If the reviewing court determines that the evidence was insufficient, then the defendant is entitled to an acquittal, and no further inquiry as to trial errors is necessary.
 
 Id.
 
 Alternatively, when the entirety of the evidence, both admissible and inadmissible, is sufficient to support the conviction, the defendant is not entitled to an acquittal, and the reviewing court must consider the assignments of trial error to determine whether the accused is entitled to a new trial.
 
 Id.
 
 Therefore, the sufficiency of the evidence is addressed first.
 

 [5]
 

 . At the suppression hearing, defense counsel argued that defendant’s statement of June 12 was not voluntary because he was questioned immediately after being confined for nine days to the psychiatric ward at West Jefferson Medical Center.
 

 [6]
 

 . It is noted that Dr. Ross testified that it was unlikely that the injuries occurred from one event, and that it was not possible for all 29 rib fractures to have occurred at the same time because only 24 were recent or perimor-tem. Dr. Manhein testified that the injuries could have occurred from one or more events.
 

 [7]
 

 . The pre-sentence investigation concluded that due to the nature of the crime coupled with defendant’s intentional and deceptive ac
 
 *236
 
 tions of disregard for life, defendant should be sentenced to the maximum term of incarceration in the Department of Corrections.
 

 [8]
 

 .
 
 Anseman
 
 states, in dicta, that the duty to see that children are properly cared for includes seeking appropriate medical care when a child appears in need of same.
 
 State v. Anseman, 607
 
 So.2d at 671.